**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**Henry A. SINGER, Defendant.**

**No. 90 Civ. 4316 (LMM).**

United States District Court, S.D. New York.

Feb. 18, 1992.

Memorandum and Order Unsealed Feb. 27, 1992.

Kevin O'Rourke, U.S. S.E.C., Washington, D.C., for plaintiff.

Morvillo Abramowitz & Grand, New York City, for defendant.

## MEMORANDUM AND ORDER

McKENNA, District Judge.

Plaintiff Securities and Exchange Commission has commenced this civil action against defendant Henry A. Singer for alleged violations of the Securities Exchange Act Section 10(b) and Rule 10b–5 thereunder. By this order, the Court decides a motion submitted on behalf of defendant for summary judgment pursuant to Fed. R.Civ.P. 56 seeking dismissal of plaintiff's civil claims.

For the reasons set forth below, defendant's motion is denied.

### FACTS

Defendant Henry A. Singer ("Singer") is a lawyer with the New York firm of Morrison, Cohen, Singer & Weinstein. Plaintiff Securities and Exchange Commission ("SEC") has instituted this civil injunctive action charging Singer with violation of Section 10(b) of the Securities Exchange Act of 1934 [15 U.S.C. § 78j(b)] ("Section 10(b)") and Rule 10b–5 [17 C.F.R. § 240.-10b–5] ("Rule 10b–5") thereunder. Additionally, the SEC is seeking the disgorgement of any illegally obtained profits and the payment of a penalty pursuant to the Insider Trading Sanctions Act of 1984 [15 U.S.C. § 78u(d)(3)(A)].

The basis of plaintiff's action is defendant Singer's purchase on two occasions of the stock of WearEver Proctor–Silex, Inc. ("WearEver") while he was allegedly in possession of material, non-public information concerning that corporation. Specifically, Singer purchased 5000 shares of WearEver stock on August 19, 1987, and placed a limit order for additional WearEver stock on November 2 of that same year. The fact of these purchases is not in dispute. Rather, the focus of the inquiry is 1) the content of information allegedly made available to Singer prior to the August 19, 1987 purchase as a result of his relationship with Lawrence McLernon, an outside member of the Board of Directors of WearEver, and 2) the materiality of information known to Singer at the time of the November 2 order as a result of his position as an attorney for the Special Committee of the Board of WearEver.

During 1987, Henry Singer and his law firm represented Litel, a company of which Lawrence McLernon was the Chief Operating Officer, on possible acquisitions and a potential management LBO. Singer had worked closely with McLernon, and the two had developed a strong business relationship as well as a very close personal friendship. The two communicated many times a week, in person, by phone, or by fax, and socialized together approximately every quarter even though the two lived in different cities. (McLernon Tr. at 26–27.) It was characteristic of their relationship that McLernon would speak to Singer in confidence about professional, legal and personal problems. Topics of conversation ranged from taxes, estate planning, and personal investments, to concerns about children. *Id.* at 22. McLernon characterized their relationship as being so close that there was a "stream of consciousness" between them. *Id.* at 60–61.

At the same time that Singer and McLernon were working together on matters relating to Litel, McLernon was also an outside member of the Board of Directors of WearEver. It is alleged by plaintiff that on or about July 13, 1987, McLernon learned that the management of WearEver was considering proposing an LBO of the company. On or before August 17, McLernon was allegedly informed that management would be going forward with the LBO and that the contemplated price, at a premium above the then current market price, would be proposed at the WearEver Board meeting scheduled for August 19,

1987. (Pl.'s Mem. in Opp'n at 16–17 [hereinafter "Pl.'s Mem."].)

On August 18, 1987, Singer and McLernon convened in Indianapolis on matters related to Litel. Following the meeting, the two flew back to New York together to attend a meeting at Wesray regarding a possible Litel management LBO to be financed by Wesray. Singer alleges that, while at Wesray, he overheard information (not from McLernon) that led him to believe that "something significant was going to happen with respect to WearEver, although he didn't know what." (Def.'s Mem. in Supp. of Summ. J. at 6 [hereinafter "Def.'s Mem."].) Plaintiff disputes Singer's explanation, claiming instead that sometime between McLernon's being informed of the LBO and the morning of August 19, 1987, McLernon, consistent with the relationship that had developed between him and Singer, confided in Singer that the WearEver management was considering an LBO and solicited Singer's advice on the matter. (Pl.'s Mem. at 2–3.)

On the morning of August 19, 1987, Singer made his first purchase ever of WearEver stock, buying 5000 shares for a total cost of $66,850, through his wife's brokerage account. Singer testified that when he made this purchase he had not had any discussion with McLernon about a possible management LBO of WearEver. (Singer SEC Tr. at 80.) McLernon testified that, while he has no specific recollection of such a conversation, it is "inconceivable" to him that he did not have such a discussion based on the nature of the relationship he shared with Singer. (McLernon Tr. at 59–60.)

The WearEver management LBO, originally scheduled for August 19, 1987, was ultimately proposed on September 4, 1987, and announced in a press release the same day. Singer and his law firm were retained to represent the Special Committee of the WearEver Board of Directors that was charged with reviewing the fairness of the proposal. Additional press releases of September 21, October 5, and October 9 made public the facts that: WearEver had retained Goldman Sachs to evaluate the

management LBO; the management group and the company were unable to reach an agreement on management's proposal; expressions of interest had been received from the outside; and the company "would be supportive of any third-party proposal found by the Board to be more favorable to stockholders than the management proposal." (Def.'s Mem. at 10–12, *citing* Wearever Press Releases.)

As a result of his role as counsel to the Special Committee, Singer was privy to a range of non-public information that would ordinarily come to the attention of one in his position. Such information included, according to plaintiff, a resolution passed by the WearEver Board on October 12, 1987, to take all steps necessary to explore the sale of WearEver; the identity, nature, level of interest and financial ability of entities interested in acquiring WearEver both before and after the stock market crash of October 19, 1987; Goldman Sachs' preliminary actions in pursuit of an auction of the company; and scheduling of and preparation for due diligence visits and plans to solicit additional bidders. (Pl.'s Mem. at 4–5.)

On October 28, 1987, the Special Committee met to review a list presented by Goldman Sachs of over 20 potential purchasers of WearEver. Plaintiff alleges that by this point Singer was informed that within a matter of days due diligence meetings would be conducted by selected entities with a serious interest in the company, and, moreover, that Goldman Sachs would begin actively soliciting additional prospective bidders as of November 2 or 3. *Id.* at 48–49.

On November 2, 1987, Singer placed a limit order for 5000 shares of WearEver stock at 9½ per share. Consistent with this order, his broker purchased 1600 shares at a total cost of $15,200. Singer explains that this transaction was part of a larger strategy of "averaging down" after the stock market crash. (Def.'s Mem. at 13.) Plaintiff claims that the trade was motivated by Singer's possession of material, non-public information in violation of Section 10(b) and Rule 10b–5. In January,

WearEver issued a press release announcing an agreement to sell the company to an outside buyer, NAACO Industries, Inc., for $17.50 per share. (Pl.'s Mem. at 49.)

## DISCUSSION

### I. *Background*

Defendant has moved for summary judgment, alleging that plaintiff has failed to put forth sufficient evidence to raise a genuine issue of material fact.

Under Fed.R.Civ.P. 56(c), summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." On a summary judgment motion where the non-moving party bears the burden of proof, the moving party need only show the trial court that there is an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Rule 56(c) mandates the entry of summary judgment against such a party who fails to make a showing sufficient to establish the existence of an element essential to its case, and on which it will bear the burden of proof at trial. *Id.* at 322, 106 S.Ct. at 2552. However, in assessing a summary judgment motion, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in its favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). All reasonable inferences must be drawn against the moving party, *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), though such inferences must be supported by such facts as would be admissible in evidence. Fed. R.Civ.P. 56(e).

Plaintiff's action derives from the insider trading laws which provide a vehicle for civil, as well as criminal, sanctions for unlawful conduct in a securities transaction. Section 10(b) prohibits use "in connection with the purchase or sale of any security

... [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe...." 15 U.S.C. § 78j(b). Pursuant to that mandate, the SEC promulgated Rule 10b–5 which makes it unlawful "to employ any device, scheme, or artifice to defraud" or "[t]o engage in any act ... which operates ... as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5.

Traditionally under Rule 10b–5, the obligation of a recipient of information ("the tippee") is derivative: liability attaches when an insider breaches his fiduciary duty to the shareholders by improperly disclosing information to the tippee and the tippee knows or should know that the insider has committed a breach. *Dirks v. S.E.C.,* 463 U.S. 646, 660, 103 S.Ct. 3255, 3264, 77 L.Ed.2d 911 (1983).

■ An alternative basis of liability, misappropriation, has been adopted in several circuits, however, including the Second, whereby Rule 10b–5 can be violated despite the absence of a direct or derivative duty to shareholders. Under the misappropriation theory, Rule 10b–5 is violated when one misappropriates material, non-public information in breach of "a fiduciary duty or similar relationship of trust and confidence," and uses that information in a securities transaction. *United States v. Chestman,* 947 F.2d 551, 566 (2d Cir.1991), *citing e.g. United States v. Carpenter,* 791 F.2d 1024, 1028–29 (2d Cir.1986), *aff'd,* 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987); *S.E.C. v. Materia,* 745 F.2d 197, 201 (2d Cir.1984), *cert. denied,* 471 U.S. 1053, 105 S.Ct. 2112, 85 L.Ed.2d 477 (1985); *United States v. Newman,* 664 F.2d 12, 17–18 (2d Cir.1981), *aff'd after remand,* 722 F.2d 729, *cert. denied,* 464 U.S. 863, 104 S.Ct. 193, 78 L.Ed.2d 170 (1983).

The components of defendant's motion for summary judgment trace the elements of misappropriation theory as articulated in *Chestman.* With regard to the August 19 trade, defendant contends that plaintiff fails to provide sufficient evidence that

Singer 1) was in possession of inside information, 2) shared a fiduciary or similar relationship of trust and confidence with McLernon, or 3) "misappropriated" information as required under plaintiff's cause of action. Defendant challenges the claim arising from the November 2 transaction because the non-public information defendant possessed at the time of the trade was allegedly not *material* as required in Rule 10b–5 cases. Each of these issues will be addressed in turn.

## II. *The August 19, 1987 transaction*

A. Was Singer in possession of inside information when he purchased WearEver securities on August 19, 1987?

### 1. *Circumstantial evidence*

Defendant argues that summary judgment is required because the SEC has failed to make a showing sufficient to establish that defendant was in possession of inside information when he purchased WearEver stock on August 19, 1987, an element which the SEC bears the burden of proving at trial. Specifically, defendant alleges that summary judgment is warranted because "the SEC has no affirmative evidence with which to meet its burden of proof." (Def.'s Mem. at 21.)

In support of this argument, defendant cites *Dyer v. MacDougall*, 201 F.2d 265 (2d Cir.1952) (L. Hand, J.), a slander action in which the court granted the defendant's motion for summary judgment because the plaintiff had no evidence of the allegedly slanderous utterance except his claim that witnesses, whose testimony was against him, were flagrant liars. *Dyer* is wholly unpersuasive and clearly distinguishable on its "unusual and extraordinary" facts. *See Hoffman v. Babbitt Bros. Trading Co.*, 203 F.2d 636, 638 (9th Cir.1953).

Defendant's other supporting cases stress the non-movant's burden to provide "affirmative" evidence showing that there is a genuine issue for trial. (Def.'s Mem. at 22.) This line of reasoning confuses the issue by mischaracterizing "affirmative" proof as a type of evidence which is distinct from and mutually exclusive of "circum-stantial" evidence. Circumstantial evidence is defined as indirect evidence, "[t]estimony not based on actual personal knowledge or observation of the facts in controversy, but on other facts from which deductions are drawn, showing indirectly the facts sought to be proved." *Black's Law Dictionary* (6th ed. 1990) (citation omitted). By contrast, "affirmative proof" is "[s]uch evidence of the truth of matters asserted as tends to establish them, *regardless of the character of evidence offered.*" *Id.* (emphasis added). Clearly, circumstantial evidence is a form of affirmative evidence.

■ What defendant is actually claiming, in the Court's understanding, is that the non-movant is obliged to come forward with *direct* evidence, the true converse of circumstantial evidence. Direct evidence is "[e]vidence in the form of testimony from a witness who actually saw, heard, or touched the subject of questioning. [It is] [e]vidence, which if believed, proves [the] existence of [a] fact in issue without inference or presumption ... and is distinguished from circumstantial evidence, which is often called 'indirect'." *Id.* (citations omitted).

■ Defendant's argument is unpersuasive because the law does not, as a general matter, require that a plaintiff produce direct evidence in order to establish a prima facie case. "Circumstantial evidence is not only sufficient, but may also be more certain, satisfying, and persuasive than direct evidence." *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330, 81 S.Ct. 6, 11, 5 L.Ed.2d 20 (1960) (citation omitted). Looking specifically at insider trading laws, it is clear that "[p]roof of insider trading can well be made through an inference from circumstantial evidence and not solely upon a direct testimonial confession." *SEC v. Bluestone*, 1991 WL 83960, 1 (E.D.Mich.1991). Courts in the Southern District have held that circumstantial evidence such as suspicious timing of trades, contacts between potential tippers and tippees, and incredible reasons for such trades provide an adequate basis for inferring that tipping activity has occurred. *SEC v.*

*Musella,* 748 F.Supp. 1028, 1038 (S.D.N.Y. 1989) ("*Musella II* "); *SEC v. Musella,* 578 F.Supp. 425, 441–42 (S.D.N.Y.1984) ("*Musella I* ").

Defendant attempts to distinguish *Musella II* and *Musella I,* (Def.'s Reply Mem. at 9), but defendant's contentions negate neither the principle of these cases nor their applicability to the instant case. Specifically, the Court finds no basis for distinguishing the use of circumstantial evidence to show intent in *Musella II* from its use to show possession of inside information in the instant case. As for *Musella I,* the standard for issuance of a preliminary injunction is that the SEC is required to make a "strong prima facie case" showing the elements necessary to an insider trading action. This standard is at least as rigorous, if not more so, than the standard required to withstand a motion for summary judgment. In short, defendant fails to refute the basic premise that a plaintiff can establish a prima facie case of insider trading without a direct confession from either the tipper or the tippee.

■ The next issue involves the evidence proffered in the instant case, *i.e.,* whether the quantity and quality of proof showing Singer's possession of information is sufficient as a matter of law to allow the case to proceed to trial. Sufficiency is evaluated with respect to the evidence presented to the Court in the form of pleadings, depositions, affidavits, etc., in light of the rule that the evidence put forth by the SEC, as non-movant, is to be believed, and all justifiable inferences are to be drawn in its favor, *Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514, as long as such inferences are supported by facts that would be admissible in evidence. Fed.R.Civ.P. 56(e).

Without reiterating the information recounted in the Facts section, *supra,* and without recounting the myriad additional details alleged in plaintiff's memorandum, it should be noted that plaintiff has put forth a substantial quantity of circumstantial evidence in this case. Arguably, there may be enough similarity between the circumstantial evidence asserted in the instant case and that in *Musella II* and *Musella I* to persuade the Court to allow the case to go to trial on that basis alone.[1]

The Court need not rely solely on circumstantial evidence, however, because plaintiff also offers direct evidence—Lawrence McLernon's testimony—going to the fact in issue, whether Singer possessed inside information when he purchased WearEver securities on August 19. McLernon's testimony, if admissible, would render unnecessary a decision which turns solely on circumstantial evidence.

### 2. The testimony of Lawrence McLernon

The essence of McLernon's testimony is his *belief* that he informed Singer about the WearEver LBO prior to Singer's purchase of WearEver securities on August 19, 1987, and his *opinion* that it is "inconceivable" that he did *not* so inform Singer, based on the relationship between them. (McLernon

---

**1.** The shared factors include a long-term friendship between the tippee and the tipper (*Musella I* and *II* ); the occurrence of defendant's trading shortly after communications between the tipper and tippee which afforded an opportunity for inside information to be passed (*II* only); realization by the defendant of a substantial gain shortly after making the suspicious purchase(s) (*I* and *II* ); the investment of a substantial dollar amount in a suspicious purchase, giving rise to the inference that the buyer had an undisclosed, unlawful source of confidence (*I* and *II* ); a reasonable argument by plaintiff that defendant's explanation for his trades is not credible (*I* and *II* ); and facts supporting the inference of defendant's consciousness of guilt (*I* ).

On the other hand, the *Musella* cases involve several factors the absence of which in the instant case weigh in favor of distinguishing the cases so as to make the *Musella* comparison inapposite. Particularly, unlike the instant case, both *Musella* cases involved several instances of trades involving different securities; both involved not just one alleged tippee but a ring of tippees who were conducting parallel suspicious trading; in *Musella I,* the defendant had a highly suspicious absence of a previous trading history; in *Musella II,* the defendant was trading exclusively in securities tied to alleged tips, even though, as an experienced broker, he would have been expected to trade on a range of information. The absence of these factors, it can be argued, makes *Musella I* and *II* an unsteady base for the case against Singer to go forward.

Tr. at 59–60.) In determining the admissibility of McLernon's testimony, the main issues arise under the Federal Rules of Evidence as to relevance and personal knowledge/opinion testimony.

■ Before considering these questions, however, the Court addresses briefly defendant's objection to the testimony on the basis of summary judgment principles. Specifically, defendant argues that the SEC cannot meet its burden of proof to defeat defendant's summary judgment motion with deposition testimony which is vague and inconclusive, claiming that "McLernon repeatedly testified that he did not have any specific recollection of having told Mr. Singer about a possible WearEver management [LBO] on or before August 18, 1987," and that the gist of the testimony is "McLernon's speculation about a conversation he does not recall." (Def.'s Mem. at 25.) In support of this argument, defendant cites *Erickson v. Said,* 42 F.R.D. 170 (S.D.N.Y.1967), and *Carter v. Newsday, Inc.,* 528 F.Supp. 1187 (E.D.N.Y.1981).

*Erickson v. Said* is wholly distinguishable because in that case the party opposing the summary judgment motion had put forth no countervailing evidence and could not show that any such evidence would be available at trial, 42 F.R.D. at 173, whereas here the SEC has proffered a substantial amount of circumstantial evidence as discussed *supra. Carter v. Newsday* is inapposite because the SEC is not relying on McLernon's *lack* of recollection to put a fact in issue. McLernon's statements, taken as a whole, could be interpreted by a reasonable jury to mean that McLernon *does have personal knowledge* that he did tell Singer about the LBO, but he simply cannot remember the specific circumstances. The lapse in recall, when taken in the context of McLernon's other statements, need not at all be interpreted as McLernon's saying that such a conversation did not occur.

Turning to evidentiary issues, the Court is mindful that Rule 102 (Purpose and Construction of the Federal Rules of Evidence) "establishes flexibility as the theme of the Federal Rules of Evidence.... Flexibility is necessary because Rule 102 ... prefers general, normative goals above subservience to specific, technical rules...." Jack B. Weinstein & Margaret A. Berger, 1 *Weinstein's Evidence* § 102[01] at 102–6 (1991).

■ The threshold question of admissibility is whether McLernon's testimony is relevant under Fed.R.Evid. 401. A witness' belief as to the existence of a fact can be relevant. *North Am. Philips Co. v. Church,* 375 F.2d 93, 95–96 (2d Cir.1967). McLernon's belief that he told Singer about the LBO is relevant because it makes more probable than not the fact in issue, which is whether McLernon actually did tell Singer about the LBO. While McLernon admits that he cannot specifically remember the conversation or its location, evidence need not be conclusive in order to be relevant and admissible. *Contemporary Mission, Inc. v. Famous Music Corp.,* 557 F.2d 918, 927 (2d Cir.1977); *North Am. Philips Co.,* 375 F.2d at 97. Nonconclusive evidence should still be admitted if it makes a proposition more probable than not; factors which make evidence less than conclusive affect only weight, not admissibility. *Contemporary Mission,* 557 F.2d at 927. In short, the defect in McLernon's recollection may be a defect in credibility, but it is insufficient to bar the testimony altogether on grounds of relevance.

■ The second evidentiary issue as to the admission of McLernon's testimony involves Fed.R.Evid. 701 on opinion testimony and the personal knowledge requirement of Rule 602.

Fed.R.Evid. 701 provides that "[lay witness'] testimony in the form of opinions or inferences is limited to those opinions or inferences which are ... rationally based on the perception of the witness...." In order to comply with this requirement, the testimony must initially fulfill the personal knowledge requirement of Rule 602 which is incorporated in Rule 701. Weinstein & Berger, *supra,* at 701–14 (citations omitted)

& 602–4.[2]

Fed.R.Evid. 602 requires that a witness testify on the basis of personal knowledge. Citing *United States v. Evans*, 484 F.2d 1178, 1181 (2d Cir.1973), for the proposition that the rule requires both personal observation and *the recollection of that observation*, defendant alleges that McLernon cannot provide competent testimonial evidence under Rule 602 because "[his] *belief* that he talked to Mr. Singer on August 18 [about the LBO] is ... not his *recollection*." (Def.'s Mem. at 27) (emphasis added).

■ Rule 602 does not require the witness' personal knowledge to rise to the level of certainty to be admissible. *United States v. Reitano*, 862 F.2d 982, 987 (2d Cir.1988); *Evans*, 484 F.2d at 1181. Testimony is admissible even though the witness is not positive about what he perceived, provided the witness had an opportunity to observe and obtained some impressions based on his observations. *Evans*, 484 F.2d at 1181; Weinstein & Berger, *supra*, at 602–12 (citations omitted). There is no question that McLernon had an opportunity to observe the facts upon which he bases his testimony, insofar as those facts include his own behavior (allegedly disclosing to Singer the possibility of an LBO) and the observable interactions between himself and Singer which formed the basis of their relationship.

What defendant focuses on as McLernon's absence of recollection—his *belief* that he told Singer of the LBO without recollection of the circumstances—is insufficient to bar the testimony under Rule 602. As discussed *supra*, a reasonable jury could interpret the totality of McLernon's statements to mean that McLernon *does have personal knowledge* that he told Singer about the LBO even though he cannot remember the circumstances of the conversation. Testimony can be admissible under Rule 602 even if the witness has only a broad general recollection of the subject matter. Weinstein & Berger, *supra*, at 602–13, *citing United States v. Peyro*, 786 F.2d 826, 830 (8th Cir.1986).

■ Notably, moreover, a witness' *conclusion based on personal observations over time* may constitute personal knowledge despite the witness' inability to recall the specific incidents upon which he based his conclusions. In *Joy Manufacturing*, 697 F.2d 104, an action involving damages arising from the failure of two furnaces, the witness originally stated that his estimate as to damages was derived from records and from personal knowledge. It was later elicited that he had only received a summary of the records; that he was uncertain as to what records had been used in preparation of that summary; and that he did not remember each specific day that the furnaces failed, how much down time there was, or the reasons for it in each instance. The trial court found that the witness' lack of personal knowledge made his non-expert opinion about percentages [of losses due to furnace downtime] "mere speculation" and "unbelievable"; the court struck the witness' testimony because he didn't remember "in his mind" the specific knowledge on which his opinions were based. *Id.* at 110. On appeal, the record revealed that the witness had "extensive personal knowledge" of the furnaces stemming from direct involvement with their daily operation. *Id.* at 112. Addressing the incorporation of the personal knowledge requirement into Rule 701, the Third Circuit found an abuse of discretion and reversed, ruling that the witness had sufficient knowledge of the subject to make an estimate of the downtime resulting from the furnace problems:

> His opinion was rationally based on his knowledge, as a personal observer, of Joy's furnace operation. His inability to

---

**2.** It is suggested that originally the Rule 701 limitation on opinions was merely an alternative statement of the Rule 602 requirement of personal knowledge. *Id.* at 602–4 n. 3 (citation omitted). The Third Circuit has observed, after addressing the personal knowledge requirement of Rule 602, that "[the] same analysis must be applied when deciding whether a witness's opinion is rationally based on his perception for the purposes of Fed.R.Evid. 701. The court is in essence requiring ... the best evidence available—first-hand knowledge versus second-hand knowledge...." *Joy Mfg. Co. v. Sola Basic Indus., Inc.*, 697 F.2d 104, 111 (3d Cir.1982).

state precisely why a furnace was inoperable at a particular time was the proper material for effective cross-examination rather than a basis to hold his testimony inadmissible.

*Id.*

As in *Joy Manufacturing,* McLernon's opinion that he told Singer of the LBO on or prior to August 18, 1987, is rationally based on his knowledge, accumulated over a period of time, of the relationship that existed between them. McLernon's inability to provide the specific circumstances of a conversation does not render inadmissible his conclusion that the conversation did occur. As with relevancy, defects in recollection do not render testimony inadmissible as personal knowledge/opinion but rather are factors for consideration by the jury. *Id.; Peyro,* 786 F.2d at 830.

The Court's conclusion is not affected by the fact that the knowledge to which McLernon has testified derives, in part, from his observations of his own past behavior (statements). Like the instant case, *M.B.A.F.B. Fed. Credit Union v. Cumis Ins. Soc'y, Inc.,* 681 F.2d 930 (4th Cir.1982), involved the question of admissibility, under Rule 602, of a witness' ambiguous testimony as to his making a past statement, where the information allegedly conveyed in the statement was directly relevant to a critical fact in issue. When asked whether he told the Credit Union general manager of the very low value of real estate used as collateral for his loan, the witness answered "I think it was brought out ... but I don't recall ...; I don't know but it's possible." *Id.* at 934. The testimony was admitted despite the witness' manifest uncertainty and inability to provide details as to when or where he might have made the statement. The Fourth Circuit conceded that the question of admissibility was "close," but found no abuse of discretion by the trial court.

McLernon's testimony as to his own past statement is much more definite than that of the witness in *M.B.A.F.B. Fed. Credit*

*Union.* McLernon affirms that he is sure of his position to "a moral certitude." McLernon states "[m]y belief is that we discussed it [prior to August 19]", and that "it's *inconceivable* to me that we didn't discuss it." (McLernon Tr. at 59–60, 150–51; McLernon Def.Tr. at 4) (emphasis added). Additionally, the instant case is more persuasive as to admissibility because McLernon articulates a rational basis for his belief—"a relationship that was so close that it was almost a stream of consciousness" (McLernon Tr. at 60–61)—which is supported by extrinsic evidence of their frequent communications. As a result, the Court finds McLernon's testimony to be worthy of consideration by the jury as a statement based on personal knowledge.

■■■ Insofar as McLernon's testimony satisfies the condition of personal knowledge, the SEC claims that McLernon's statements are admissible as "squarely within the requirements of Rule 701," (Pl.'s Mem. at 36).[3] The Court sees no reason to exclude either McLernon's belief that he told Singer of the LBO or his perception of the ongoing relationship between himself and Singer, since these opinions are based on information derived from McLernon's personal experience. In construing Rule 701,

> [t]he emphasis belongs on what the witness knows and not on how he is expressing himself. The trier of fact can normally be depended on—with the aid of counsel—to pick up the non-verbal signals which ... indicate fairly clearly when the witness is describing what he saw and when he is describing what he thinks happened; the trier of fact also should generally be depended upon to give whatever weight or credibility to the witness' opinion as may be due.

Weinstein & Berger, *supra,* at 701–32 (citations omitted).

In sum, the evidence, both circumstantial and direct (in the form of McLernon's testimony), is sufficient to support a jury finding that Singer was in possession of inside

---

**3.** Defendant challenges this assertion, alleging that McLernon's perception of the relationship he had with Singer is character evidence prohib-

ited by Rule 404. On the contrary, the relationship is merely a source of McLernon's opinion.

information when he purchased WearEver securities on August 19, 1987.

B. Did Singer and McLernon share "a fiduciary or other similar relationship of trust and confidence" at the time of the August 19 purchase?

■ The Second Circuit recently discussed the parameters of liability under the misappropriation theory in *United States v. Chestman:*

> In contrast to ... *Dirks,* the misappropriation theory does not require that the buyer or seller of securities be defrauded. Focusing on the language "fraud or deceit upon *any* person" (emphasis added), we have held that the predicate act of fraud may be perpetrated on the *source* of the non-public information, even though the source may be unaffiliated with the buyer or seller of securities. To date we have applied the theory only in the context of employment relationships. District courts in this Circuit have applied the theory in other settings as well as in the employment context.

947 F.2d at 566. (citations omitted) (second emphasis added).

Stated differently, "[the misappropriation theory] attempts to impose criminal culpability for improper trading on 'outsiders,' *e.g.,* persons who lack a direct fiduciary relationship with a corporation or its shareholders." *United States v. Reed,* 601 F.Supp. 685, 699–700 (S.D.N.Y.), *rev'd on other grounds,* 773 F.2d 477 (2d Cir.1985).

> [O]utsider trading liability is premised on the common law principle that when a fiduciary profits from confidential information that he had received because of his fiduciary status, he breaches a legal duty to the person or entity that entrusted him with the information. The misappropriation of secret information for personal aggrandizement in breach of such a relationship constitutes fraud.... In the context of the securities laws, it does not matter for the purposes of assessing liability whether the recipient of the information is actually trading in the securities issued by the source of the information. Rather, the duty is breached by

the misappropriation and resulting profit, and a constructive trust attaches.

*Id.* at 700 (footnote omitted).

A central issue in the instant case is whether Singer and McLernon shared "a fiduciary or other similar relationship of trust and confidence" so as to raise the issue of liability, under the misappropriation theory, in connection with Singer's purchase of WearEver securities on August 19, 1987.

On the issue of "fiduciary duty," the attorney-client relationship, as plaintiff alleges to have existed between Singer and McLernon, is counted among the "hornbook fiduciary relations." *Chestman,* 947 F.2d at 568. The concept of a "similar relationship of trust and confidence" is more enigmatic. "As the term 'similar' implies, a 'relationship of trust and confidence' must share the essential characteristics of a fiduciary association." *Id.* In describing these characteristics, the court in *Chestman* states:

> "At the heart of the fiduciary relationship" lies *"reliance,* and *de facto control* and *dominance."* The relation "exists when *confidence* is reposed on one side and there is resulting *superiority* and *influence* on the other...." "A fiduciary relationship involves *discretionary authority* and *dependency:* One person depends on another—the fiduciary—to serve his interests."

*Id.* at 568–69 (citations omitted) (emphasis added).

In the final analysis, the assessment of the existence or absence of a confidential relationship invariably requires a series of factual findings and generally rests with the finder of fact, *i.e.,* the jury, at trial. *Reed,* 601 F.Supp. at 705. The question before the Court at this juncture, then, is whether the plaintiff has proffered enough evidence to support a jury finding that Singer owed McLernon a fiduciary duty, or that the two shared a "similar relationship of trust and confidence" at the time Singer purchased WearEver securities.

Plaintiff advances a series of facts in support of its claim that Singer acted as an attorney for McLernon and thus shared an

attorney-client relationship of confidentiality. Specifically, Singer was a deal lawyer for Litel, a company of which McLernon was a founder, a significant shareholder, and CEO. Singer represented the personal interests of McLernon and other members of the Litel management team when they were attempting an LBO of Litel, and played the same role in a subsequent, successful LBO of Litel. The two communicated about business-related matters either face-to-face, by phone, or by fax, "many times a week." (McLernon Tr. 16–20, 27.) Outside the business context, McLernon consulted Singer on personal legal matters, including tax planning, estate planning, and McLernon's ownership of stock. *Id.* at 22–24. Finally, McLernon expected that, when he spoke to Singer about business and legal matters, the conversations would be confidential pursuant to the attorney-client privilege. (McLernon Tr. at 31–34.)

Apart from allegations of an attorney-client affiliation, plaintiff has submitted evidence showing a relationship of confidence and trust close to a traditional fiduciary relationship under the standards of *Chestman.* The two enjoyed a *very close personal relationship*, demonstrated by dinners together, a common vacation, and a pattern of socializing on a regular basis even though the two live in different cities. (McLernon Tr. at 26–27.) McLernon appears to have reposed a certain amount of *confidence* in Singer, evidenced by McLernon's own testimony that he regarded Singer as a "confidant" and characterized their relationship as "so close that it was almost a stream of consciousness." (McLernon Def.Tr. 6; McLernon Tr. at 60–61.) Their conversations covered a broad range of topics, not only professional but also personal, (*e.g.* concerns about children), which McLernon expected to remain confidential. (McLernon Tr. at 22–24, 31–34). McLernon appears to have *relied* on Singer and conferred upon him a measure of *superiority and influence:* a close associate of McLernon's testified that McLernon looked extensively to Singer for guidance on personal

and business matters and "relied very heavily on [his] advice," seeing him in the role of "the great eminence" (Chase Tr. 137–38, 141–42); McLernon testified that he was greatly impressed by Singer's abilities, and took his advice seriously (McLernon Tr. at 24). Finally, it can be inferred that McLernon was somewhat *dependant* on Singer for his advice, at least insofar as McLernon and Singer communicated on business matters several times a week during 1987, and McLernon tended to seek out Singer's counsel on matters of significance to him. (McLernon Tr. 27.) [4]

The court in *Chestman* mentioned in its discussion terms such as "authority", "control", and "dominance" which are not explicitly illustrated in the personal relationship between Singer and McLernon. However, the Court reads the *Chestman* opinion not as setting forth a rigid checklist but as a general characterization of a type of relationship in which it is appropriate to impose the responsibilities associated with a fiduciary association. In applying that general characterization to the facts alleged in the instant case, the Court is mindful that the determination of whether an association gives rise to a fiduciary or other similar relationship is an issue of fact:

> Judges, charged with making the determinations of law by which to structure and evaluate [factual] findings, may [assess the existence or absence of a confidential relationship] only in those cases in which it is possible and proper to conclude that, as a matter of law, such a relationship does or does not exist. The very nature of the subject matter, however, reveals that such occasions will be scarce. . . .

*Reed,* 601 F.Supp. at 705. Based on plaintiff's submissions, the Court finds there to be sufficient evidence to support a jury finding that Singer owed a fiduciary or other similar duty to McLernon arising from the attorney-client association intertwined with a confidential, personal relationship.

---

**4.** For example, when McLernon was invited to join the Board of Directors of WearEver, McLernon solicited Singer's views on what his responsibilities were and what he should watch out for as an outside director. (McLernon Tr. 12–13.)

C. Did Singer's alleged conduct constitute "misappropriation" of information so as to raise the issue of liability under Section 10(b) and Rule 10b–5?

█ Defendant claims that Singer could not have breached a fiduciary or similar duty to McLernon because McLernon (assuming, *arguendo*, that he did have the claimed pre-August 19 conversation with Singer) allegedly volunteered the information regarding the LBO and, according to defendant's reading of *Dirks*, 463 U.S. at 665, 103 S.Ct. at 3267, misappropriation does not lie unless the information is wrongfully obtained. (Def.'s Reply Mem. at 19.)

█ On the contrary, the misappropriation theory holds that "the duty to 'disclose or abstain' [from trading] arises ... from a *relationship of trust and confidence* either between the parties to a market transaction or *between the trading party and the source* of that information." *Reed,* 601 F.Supp. at 696 (emphasis added). The Second Circuit stated in *Newman* that "deceitful misappropriation of confidential information by a fiduciary, whether described as theft, conversion, or *breach of trust,* has consistently been held to be unlawful." *Newman,* 664 F.2d at 18 (emphasis added). Essentially,

> [t]he underlying rationale of the misappropriation theory is that a person who *receives secret business information from another because of an established relationship of trust and confidence between them* has a duty to keep that information confidential. By breaching that duty and appropriating the confidential information for his own advantage, the fiduciary is *defrauding* the confider who is entitled to rely on the fiduciary's tacit representation of confidentiality.

*United States v. Willis,* 737 F.Supp. 269, 274 (S.D.N.Y.1990) (emphasis added). *See Carpenter,* 791 F.2d at 1029–31.

█ It is established in the preceding section that plaintiff has carried its burden (for purposes of opposing the motion for summary judgment) regarding McLernon's disclosure of information to Singer about the WearEver LBO. It is also established, *supra,* that plaintiff has satisfied its evidentiary burden, at this preliminary stage, of proving the existence of a confidential relationship between Singer and McLernon. Despite the fact that McLernon allegedly divulged this information voluntarily, their fiduciary association burdened Singer with the responsibility to keep confidential secret business information acquired as a result of that relationship. In short, *Willis* and *Carpenter* make clear that the allegations against Singer—possession of confidential information, coupled with use of that information for purposes of personal gain—are sufficient to establish an act of misappropriation in the context of the misappropriation theory of liability.

III. *The November 2, 1987 transaction*

█ It is undisputed that, as of November 2, 1987, Singer and his firm were acting as counsel to the Special Committee of the Board of Directors of WearEver as it was pursuing the sale of the company. It is also undisputed that on November 2, 1987, Singer traded in WearEver securities. The issue is whether, at the time of this trade, the non-public information which Singer admittedly possessed was *material* information so as to incur liability under Section 10(b) and Rule 10b–5.

As recounted in the Facts section, *supra,* much information had been made known to the public as the management team at WearEver had submitted and withdrawn an LBO proposal and later had begun taking steps to explore the company's sale. However, certain information had not been disclosed to the public as of November 2, 1987, and Singer was privy to all such information by virtue of his position as attorney for the Special Committee.

For example, plaintiff alleges that it was never made public that Goldman Sachs had been retained to advise the company not just in connection with the management LBO but also with respect to offers for purchase by third parties or an auction process. Secondly, plaintiff claims that, while the October 9, 1987 press release indicated the Board's intention to review

inquiries regarding purchase of the company, information regarding the Board's decision to take *active steps toward putting the company up for auction* had not been publicly disclosed. (Pl.s Mem. at 52–53.) Thirdly, plaintiff contends that, as of a Special Committee meeting on October 28, 1987, Goldman Sachs was authorized to contact and solicit potential bidders. Finally, plaintiff claims that Singer was privy to all the details which naturally would fall into the hands of the Special Committee charged with taking the steps necessary to auction the company, including: the identities of companies from whom WearEver had received expressions of interest (McLernon Ex. 13, October 20, 1987 Memo. from Singer to McLernon); that those companies maintained their interest following the October 19 crash (Singer SEC Tr. 125–26); and that due diligence meetings on the part of companies with a serious interest in purchasing WearEver were planned to commence during the few days following the October 28 meeting (Pl.s Mem. at 48).

■■■ The issue is whether any of this non-public information to which Singer had access was "material". Information is material when there is a substantial likelihood that a reasonable investor would find it significant in evaluating whether to buy or sell securities. *Basic, Inc. v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988). Defendant argues that because the public knew on November 2, 1987, that the company was "in play," the "details" that were not public knowledge were not material as a matter of law because no bids had yet been received. In the alternative, defendant claims that the strategy of "averaging down" adequately explains the impetus behind the November 2, 1987 trade.

■■■ The materiality of future events which may or may not occur, such as a merger, depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of company activity. *Id.* at 987 (citation omitted). Because a merger can be the most important event in the life of a small company, information concerning a merger can be material at an earlier stage than would be the case with lesser transactions, even though the mortality rate of mergers in such formative stages is high. *Id.* (citation omitted).

■■■ The determination of materiality requires delicate assessments of the inferences a reasonable investor would draw from a given set of facts and the significance of those inferences to him, and these assessments are "peculiarly" ones for the trier of fact. Only if the established omissions are so obviously important to an investor that reasonable minds cannot differ on the question of materiality is the ultimate issue of materiality appropriately resolved as a matter of law. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450, 96 S.Ct. 2126, 2133, 48 L.Ed.2d 757 (1976).

This Court cannot find immaterial, as a matter of law, "details" such as the identities of companies from whom WearEver had received expressions of interest, and the imminent commencement of due diligence visits. Moreover, the Court does not find defendant's "averaging down" explanation to be at all dispositive. Trading itself can often be relevant to materiality. *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 851 (2d Cir.1968). In sum, the Court finds there to be sufficient evidence in the record for a jury to find that the non-public information which Singer possessed was material.

## SUMMARY

Defendant's motion for summary judgment is denied. The parties will complete discovery by April 30, 1992 and submit a joint pretrial order by May 31, 1992.

Certain materials submitted on the present motion were filed under seal, and this Memorandum and Order is, accordingly, also filed under seal. A separate Order, constituting this Summary section, will also be filed and will not be sealed. Within ten days of the date of this Memorandum and Order, the parties will advise the Court with specificity whether anything contained in this Memorandum and Order is, in fact,

confidential. Should it not contain confidential material, this Memorandum and Order will then be unsealed.

SO ORDERED.