**UNITED STATES of America, Plaintiff,**

v.

**Keith Joon KIM, Defendant.**

**No. CR–01–0193 CRB.**

United States District Court, N.D. California.

Jan. 15, 2002.

Patrick Robbins, Assistant United States Attorney, United States Attorney's Office, San Francisco, CA, for Plaintiff.

Michael Tubach, O'Melveny & Myers LLP, San Francisco, CA, for Defendant.

BREYER, District Judge.

## AMENDED MEMORANDUM AND ORDER

### INTRODUCTION

This case presents the interesting question of whether it is a criminal act for a member of a club to violate confidences which he has pledged to keep. The government contends that a special "fiduciary-like" relationship among club members creates this obligation. The Court, however, disagrees. While members of a club may feel a special bond, there is nothing so special about their relationship, as alleged in the indictment, that it gives rise to a legal duty not to trade on confidential information. Violation of confidences under these circumstances may warrant expulsion from the club, and even shunning by fellow members, but it does not fall within the criminal laws of the United States.

### BACKGROUND

In March 1999, defendant, Keith Joon Kim, was Chief Executive Officer ("CEO") of Granny Goose Foods, Inc. He was also a member of the Young Presidents Organization ("YPO"), a national organization of company presidents under 50 years old. The YPO is organized into regional chapters, and further divided into small forums. Defendant was a member of the 1917 Forum in Northern California.

As alleged in the indictment, the "Forum Principles" of the YPO's 1917 Forum stated that: "We operate in an atmosphere of absolute confidentiality. Nothing discussed in forum will be discussed with outsiders. Confidentiality, in all ways and for always." Indictment ¶ 7. Members were also required to comply with a written "Confidentiality Commitment" as a condition of membership. That agreement provides:

> I understand that to achieve the level of trust necessary to ensure the interchange we all seek in the Forum, all information shared by the membership must be held in absolute confidence . . . . I understand that no Forum business can be discussed with anyone outside the Forum, including spouses, "significant others," other YPO or non-YPO members . . . . I understand that breaking this contract will result in being asked to resign from the Forum. Most importantly, I understand that I have a major moral and ethical responsibility to my Forum friends who have entrusted me with their most personal feelings, problems and issues. To break this trust is to destroy all that Forum can mean to its members.

The CEO of Meridian Data, Inc. was also a member of the 1917 Forum. Meridian is a publicly traded corporation listed on NASDAQ that manufactures computer storage devices. On March 1, 1999 the 1917 Forum members departed from Northern California in a private plane for Snowmass, Colorado, for their annual retreat. Prior to departure, the CEO of Meridian informed the Forum Moderator that he could not attend because Meridian was involved in merger discussions with another company—Quantum Corporation. He authorized the Forum Moderator to tell the other members why he would be absent, but asked the Moderator to emphasize the confidential nature of the information. The Forum Moderator relayed the information to defendant and other members of the 1917 Forum.

The indictment alleges that, based on this confidential information, between March 1 and March 4, 1999 defendant

purchased 187,300 shares of Meridian stock for between $2.00 and $4.12 per share. Defendant also disclosed the information to his business partner, his brother, and his brother-in-law, all of whom purchased shares of Meridian.

On May 11, 1999 Meridian publicly announced that it had agreed to be acquired by Quantum. Meridian's share price jumped to $7.56. Defendant thereby realized a profit of $832,627 on an investment of $583,360. Defendant's business partner realized a profit of $200,885; his brother realized a profit of $27,469; and his brother-in-law realized a profit of $13,492.

Defendant was charged with one count of wire fraud, two counts of securities fraud, and one count of making a false statement. He has moved to dismiss the first three counts of the indictment (all counts except the false statement) pursuant to Federal Rule of Criminal Procedure 12(b). For the reasons stated below, defendant's motion to dismiss is GRANTED.

## DISCUSSION

### I. Legal Standard

■ Federal Rule of Criminal Procedure 12(b) permits pre-trial consideration of any defense "which is capable of determination without the trial of the general issue." When considering a 12(b) motion, the court must presume the truth of the allegations in the indictment. *United States v. Jensen*, 93 F.3d 667, 669 (9th Cir.1996). "Although the court may make preliminary findings of fact necessary to decide the legal questions presented by the motion, the court may not invade the province of the ultimate finder of fact." *United States v. Nukida*, 8 F.3d 665, 669 (9th Cir.1993) (internal citations omitted). Accordingly, "[a] defendant may not properly challenge an indictment, sufficient on its face, on the ground that the allegations are not supported by adequate evidence." *Jensen*, 93 F.3d at 669 (quoting *United*

*States v. Mann*, 517 F.2d 259, 267 (5th Cir.1975)).

### II. Securities Fraud: Misappropriation

Defendant is charged with violating section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5. There are two general theories of liability under section 10(b) and Rule 10b–5: traditional "insider" trading and "misappropriation." *See United States v. O'Hagan*, 521 U.S. 642, 651–52, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997). As the government concedes, only the misappropriation theory is relevant to this case.

■ Under the misappropriation theory, a person commits fraud "in connection with" a securities transaction, as proscribed by Rule 10b–5, "when he misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information." *Id.* at 652, 117 S.Ct. 2199. Whereas classic insider trading involves a breach of a duty between a corporate insider and the corporation's shareholders, misappropriation involves a breach of duty between the owner of the confidential information and the individual entrusted with that information. *Id.* A misappropriator is a corporate "outsider."

The central issue presented by defendant's motion is whether the relationship between defendant and the members of the 1917 Forum is such that it gives rise to a *legal* duty of confidentiality, a violation of which can serve as the predicate for criminal liability under the misappropriation theory.

### A. O'Hagan

The Supreme Court confronted the misappropriation theory for the first time in *O'Hagan*. The Court held that one who trades on material nonpublic information misappropriated in breach of a *fiduciary*

duty may be held criminally liable under section 10(b) and Rule 10b–5. *Id.* at 650. *O'Hagan* involved the breach of the fiduciary duty an attorney owes to his law firm and the firm's client. The Court concluded that O'Hagan's conduct was an appropriate basis for criminal liability because it involved the breach of a recognized duty— that between a lawyer and his firm and client. The Court emphasized, however, that there is no general duty to refrain from trading based on material nonpublic information. *Id.* at 661, 117 S.Ct. 2199.

The relationship presented in *O'Hagan* was a classic fiduciary relationship. As the government concedes, the present case does not present a classic, or "hornbook" fiduciary relationship, such as: attorney-client, executor-heir, guardian-ward, principal-agent, trustee-beneficiary, or senior corporate official-shareholder. *See United States v. Chestman,* 947 F.2d 551, 568 (2nd Cir.1991). Thus the Court must turn to other authority for guidance as to whether non-fiduciary relationships—such as the one presented here among organization members—can support misappropriation liability.

### B. *Chestman:* "Similar Relationship of Trust and Confidence"

As both parties agree, the key case for examining the precise contours of misappropriation liability—i.e., what relationships can potentially give rise to liability?—is *United States v. Chestman,* 947 F.2d 551 (2nd Cir.1991). *Chestman* involved the duty a husband owes to his wife and his wife's family. The court concluded that the specific relationship presented did not give rise to misappropriation liability because it did not share the essential characteristics of a fiduciary relations. *Id.* at 570–71.

*Chestman* held that "a person violates Rule 10b–5 when he misappropriates material nonpublic information in breach of a fiduciary duty *or similar relationship of trust and confidence* and uses that information in a securities transaction." *Id.* at 566 (emphasis added). The question is whether the relationship between defendant and the members of the 1917 Forum is a "similar relationship of trust and confidence," i.e., similar to a *fiduciary* relationship.

As an initial matter it is clear from *Chestman* that the exchange of confidential information, alone, does not give rise to a fiduciary-like relationship.[1] *Id.* at 567. Therefore, a "similar relationship" did not arise in this case merely because the CEO of Meridian entrusted defendant, and other members of the 1917 Forum, with confidential information.

Beyond this specific limitation, *Chestman* provides more general guidance as to what constitutes a "similar relationship of trust and confidence." In short, to serve as a predicate for misappropriation liability the alleged relationship must be the "functional equivalent" of a fiduciary relationship. *Id.* at 568. "As the term 'similar' implies, a 'relationship of trust and confidence' must share the essential characteristics of a fiduciary association." *Id.* Accordingly, the Court must determine whether the relationship at issue here bore the hallmarks of a fiduciary relationship.

To answer this question it is necessary to understand the essential characteristics of the fiduciary relation. As stated in *Chestman,* at "the heart of the fiduciary relationship lies reliance, and de facto control and dominance." *Id.* (internal quotations and citation omitted). The fiduciary

---

1. Although not relevant here, *Chestman* also concluded that a family relationship standing alone is insufficient. *Id.* at 568.

"relation exists when confidence is reposed on one side and there is resulting superiority and influence on the other." *Id.* at 568 (internal citation and quotation omitted).

The government argues that *Chestman's* references to superiority *and* influence, should be construed as requiring only superiority *or* influence.[2] This argument is neither supported by *Chestman* itself, nor of much logical force. The argument is largely one of semantics. The government argues that "influence" understood as synonymous with "advice" is sufficient. But *Chestman* makes clear that something more than the giving and accepting of advice is required. *Chestman* requires influence of a superior or dominating nature—not the "influence" one peer might exert on another. The government suggests that the ability to be "influential"— the way colleagues or peers might be—is sufficient, but *Chestman* requires more.

In examining the essential characteristics of a fiduciary relation—specifically the existence of dominance or superiority in the relationship—it is instructive to look at cases upholding the misappropriation theory of criminal liability. These have generally involved the attorney-client, employer-employee, and psychiatrist-patient relationship. *See, e.g., United States v. O'Hagan,* 521 U.S. 642, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997) (attorney-client); *United States v. Falcone,* 257 F.3d 226 (2nd Cir.2001)(employer-employee); *United States v. Willis,* 737 F.Supp. 269 (S.D.N.Y.1990)(psychiatrist-patient). These are not relationships among equals. As *Chestman* requires, they are characterized by superiority, dominance, or control. Attorneys and psychiatrists are possessed of superior knowledge and expertise. Clients and patients must relay confiden-

tial information to receive the benefit of that superior knowledge (it comes in the form of legal advice and medical treatment). The employee-employer relation presents the classic principal-agent scenario and its corresponding common law legal duty.

As the analysis in *Chestman* and the examples explored above make clear, the primary essential characteristic of the fiduciary relation is some measure of superiority, dominance, or control. Therefore, this Court holds that a "similar relationship of trust and confidence" must be characterized by superiority, dominance, or control. Accordingly the dispositive issue in this case is whether the relationship between defendant and the CEO of Meridian and other members of the 1917 Forum is best characterized as an equal relationship between peers or as a relationship involving a degree of dominance.

Of course, fiduciary-like dominance can arise in many contexts. For example, in the attorney-client and psychiatrist-patient context it arises largely from disparate knowledge and expertise (this inherent disparity has been supplemented with a legal duty). In the employer-employee context it arises from common law principal-agent principles.

■ The Court has undertaken a review of the cases cited by the parties. In those cases upholding misappropriation liability, fiduciary-like dominance generally arises out of some combination of 1) disparate knowledge and expertise, 2) a persuasive need to share confidential information, and 3) a legal duty to render competent aid. The presence or absence of these characteristics is the key to determining whether the relation between defendant and the

---

2. This argument is based, in part, on Black's Law Dictionary which states that a "fiduciary relationship" can arise "when one person places trust in the faithful integrity of another, who as a result gains superiority or influence over the first." Blacks's Law Dictionary 712 (7th ed.1999).

members of the 1917 Forum is characterized by superiority, dominance, or control. Whether all of these characteristics must be present, and to what degree, is not decided here. As detailed below, the relationship alleged in the indictment does not bear any of these characteristics. As a result it is not one of superiority, dominance, or control. Accordingly, it cannot be a "similar relationship of trust and confidence." Therefore the indictment fails as a matter of law to allege facts establishing a basis for misappropriation liability.

Each of the key characteristics is discussed in turn below.

### 1. Disparate Knowledge and Expertise

The government does not allege disparate knowledge or expertise. Indeed the very membership criteria of the YPO—large company presidents under the age of 50—ensures similar levels of achievement, experience, and expertise among members. At most, different members of the YPO bring to bear a different perspectives on each others problems.

### 2. Persuasive Need to Share Confidential Information

There is no persuasive need for YPO members to share material, nonpublic information with each other. The sharing of such information may enliven meetings or marginally improve advice, but by no means is it necessary. It should be noted, that the particular communication at issue here—that the CEO or Meridian would not attend the meeting because of pending merger discussions—was completely gratuitous. It is hard to fathom any legitimate reason for sharing this material, nonpublic information and running the risk that it would leak.

Extending misappropriation theory to cover the situation before the Court would serve to legitimize the disclosure that took place because it would place primary blame with the defendant rather than the CEO of Meridian. The Court is convinced that this is the wrong result. The CEO of Meridian should not have told the 1917 Forum members why he was missing the meeting—even if he emphasized the confidential nature of his reason. While barring misappropriation liability in this case may permit a "wrong" to go unpunished, the proposed extension of misappropriation theory would have the practical effect of encouraging the spread of confidential information more widely, thereby increasing the likelihood of abuse. The law should discourage gratuitous sharing of nonpublic information, by placing responsibility on the sources of that information to share it only for substantial reasons.

Where misappropriation theory is appropriately applied, the spread of the confidential information cannot be stanched at its source without unacceptable ramifications. Clients need the advice of lawyers. Patients need treatments. And employers have to be able to do their jobs. For example, in *United States v. Falcone*, 257 F.3d 226 (2nd Cir.2001), there was no practical alternative to a magazine distribution system that gives employees physical access to pre-release publications. By contrast, the CEO of Meridian could have simply waited, without real repercussions, until the merger discussions were public before sharing them with the members of the YPO.

Along these lines it is worth analyzing more closely *O'Hagan*, where the Court reasoned: "it makes scant sense to hold a lawyer like O'Hagan a § 10(b) violator if he works for a law firm representing the target of a tender offer, but not if he works for a law firm representing the bidder." *O'Hagan*, 521 U.S. at 659, 117 S.Ct. 2199. Misappropriation theory is targeted at "outsider" trading, i.e., breaches that do not involve a duty to the traded company and its shareholders. This case, however, involves a breach of a duty allegedly owed

to an insider in the company whose securities were traded. Generally speaking traditional insider trading liability addresses such breaches through tipper-tippee liability. The government is attempting to redeploy misappropriation theory here to the rare case were the intentional disclosure of material, nonpublic information by an insider does not result in tipper-tippee liability.[3] While this alone is not a reason to reject the government's argument, it does show that this case falls outside the misappropriation paradigm.

### 3. Legal Duty to Render Aid

Fiduciary-like relations involve a legal duty to render competent aid. No legal duty is present. The indictment suggests a "duty" to "YPO 1917 and its member, the CEO of Meridian." Indictment ¶ 12. But this is not a legal duty. No one suggests that the CEO of Meridian or other members of the 1917 Forum have a civil cause of action against defendant, even if his actions were malicious, based on their mutual membership in the YPO. The existence of the explicit confidentiality agreement does not change this conclusion. The agreement may memorialize a moral and ethical duty that members undertake, but it does not create a legal one.

Beyond the three factors discussed at length above, the indictment does not allege any other facts that reasonably lead to the conclusion that any measure of superiority, dominance, or control existed in the relationship between defendant and the members of the 1917 Forum. The utter absence of the three factors merely reinforces what common sense suggests at the outset—the YPO is a club. Its members are peers who gather to socialize, exchange information, and seek advice. The members are equals.

In short, the relationship between defendant and the members of the 1917 Forum was not characterized by any measure of superiority, control, or dominance. It was not the functional equivalent of a fiduciary relationship. While the rules of the club may have forbid defendant's actions, the federal securities laws—at least in this instance—did not.

### C. Other Case Law

While not binding on this Court, *United States v. Reed*, 601 F.Supp. 685 (S.D.N.Y.), *rev'd. on other grounds*, 773 F.2d 477 (2d Cir.1985), warrants some discussion because the of the attention it receives in this area. *Reed* suggests that a relationship need not entail superiority, dominance, or control to serve as a basis for misappropriation liability. *Reed* involved a father-son relationship characterized by a history of confidential business communications. The court concluded that despite the absence of allegations of control, a jury question existed as to whether a fiduciary-like relationship existed sufficient to support misappropriation liability and denied a motion to dismiss. *Id.* at 705.

*Reed* recognized two types of "confidential relationships." *Id.* at 712–13. The first, with its origin in cases where the courts set aside fraudulent transactions, requires a degree of dominance. *Id.* at 712. The second, exemplified by the oral trust, does not require such an allegation. *Id.* at 713. *Reed* suggested that either could serve as a basis for misappropriation.

In the opinion of this Court, *Reed* conflates "confidential" relationships with those that share the essential characteristics of a fiduciary relationship. Indeed, as the Second Circuit concluded when consid-

---

**3.** Presumably the government's reliance on the misappropriation theory reflects their conclusion that they cannot prove a mental state of the CEO of Meridian that would support tipper liability when he revealed the merger information.

ering *Reed's* definition of confidential relationship, "[u]seful as such an elastic and expedient definition of confidential relations, i.e., relations of trust and confidence" might be in other areas of the civil law, "it has no place in the criminal law." *Chestman,* 947 F.2d at 570.

### D. SEC Regulation

The conclusion reached above is bolstered by statements of the Securities and Exchange Commission ("SEC") since defendant's trading took place.

The defendant concedes that under the current regulation, which became effective August 24, 2000, the indictment alleges facts amounting to criminal misappropriation. The new regulation defines three non-exclusive circumstances under which "a person has a duty of trust or confidence for purposes of the 'misappropriation' theory of insider trading" for purposes of Rule 10b-5. 17 C.F.R. § 240.10b5-2 (preliminary note). They are:

(1) Whenever a person agrees to maintain information in confidence;

(2) Whenever the person communicating the material nonpublic information and the person to whom it is communicated have a history, pattern, or practice of sharing confidences ... or

(3) Whenever a person receives or obtains material nonpublic information from his or her spouse, parent, child, or sibling ....

*Id.* Both the first and second scenarios would apply to defendant's conduct in this case. The fact that the SEC saw a need to adopt this new rule adds force to the argument that the conduct it covers was not legally proscribed before adoption of the rule.

Prior to the rule's adoption, a December 20, 1999 SEC release described the proposed rule and solicited comments. Selective Disclosure and Insider Trading, 1999 WL 1217849 (SEC Release Nos. 33–7787, 34–42259, and IC–24,209)(Dec. 20, 1999). While the SEC release described the law, as it existed then, regarding the scope of misappropriation liability as "unsettled," *id.* at 2, a full reading of the release makes clear that the proposed rule was designed to establish new law, not clarify existing law. The SEC's dissatisfaction with the law at the time as set forth in *Chestman* (which governs this case) is clear. As the SEC stated:

In our view, however, the Chestman majority's approach does not fully recognize the degree to which parties to close family and personal relationships have reasonable and legitimate expectations of confidentiality in their communications. For this reason, we believe the Chestman majority view does not sufficiently protect investors and the securities markets from the misappropriation and resulting misuse of inside information.

*Id.* at 22. The SEC concluded by stating that "there is good reason for the broader approach we propose today for determining when family or personal relationships create 'duties of trust or confidence' under the misappropriation theory." *Id.* at 23.

In the SEC's opinion, the three bases for misappropriation liability described in the new rule were not a basis for liability under *Chestman.* While the SEC's opinion is not binding on this Court, it is persuasive given the SEC's role in the development of insider trading law through rule making and its enforcement responsibilities. At a minimum, the history of the new rule supports this Court's conclusion that criminal liability should not attach to defendant's conduct.

The government's argument that the "broader" approach of the new rule is somehow limited to the third category (family members), because the first two categories "merely restate the principles

articulated in *Chestman*," is difficult to take seriously. The language of the release makes clear the new rule applies to family "or other non-business relationships." *Id.* at 2.

One aspect of the SEC release may add marginal support to the government's position. The release suggests that an express confidentiality agreement is sufficient to support misappropriation liability under *Chestman*. *Id.* at 22. The SEC release does not detail what type of express agreement would serve as a sufficient basis for liability under *Chestman*.

In the Court's opinion, however, an express agreement can provide the basis for misappropriation liability only if the express agreement sets forth a relationship with the hallmarks of a fiduciary relationship detailed above. Even if the members of the YPO were bound by an express confidentiality agreement, that agreement appealed only to the members' ethics and morality; it did not give rise to any legal duties.

### E. Conclusion

Two district courts to address the issue have concluded that the existence of a "similar relationship of trust and confidence" is a question of fact to be determined by the jury. *See Reed,* 601 F.Supp. at 705; *SEC v. Singer,* 786 F.Supp. 1158, 1169 (S.D.N.Y.1992). Accordingly, at the motion to dismiss stage the question before the Court is whether the allegations in the indictment, assuming they are true, support a jury finding that a "similar relationship of trust and confidence" existed between defendant and the members of the 1917 Forum.

For the reasons stated above, the Court concludes as a matter of law that the allegations of the indictment, if proven, would not support a finding that there was a "similar relationship of trust and confidence" between defendant and the mem-

bers of the 1917 Forum. Accordingly, counts two and three of the indictment (securities fraud) are DISMISSED.

### III. Wire Fraud

Defendant is also charged with one count of wire fraud in violation of 18 U.S.C. § 1343. The alleged fraud underlying the securities fraud charges also serves as the basis for the wire fraud charge. As the government concedes, a wire fraud conviction must be based on breach of an underlying duty. For the reasons stated above no such duty is present here. Accordingly, the indictment also fails to allege a wire fraud violation. Count one of the indictment is DISMISSED.

### CONCLUSION

For the reasons stated above, defendants motion to dismiss is GRANTED. Counts one, two, and three of the indictment are hereby DISMISSED.

**IT IS SO ORDERED.**

### AMENDED MEMORANDUM AND ORDER

The Memorandum and Order issued by this Court on November 20, 2001 is hereby superceded by the Amended Memorandum and Order issued concurrently herewith.

**IT IS SO ORDERED.**