**UNITED STATES of America,**

**v.**

**John J. CASSESE, Defendant.**

**No. 03 Cr. 302 (RWS).**

United States District Court,
S.D. New York.

July 23, 2003.

Honorable James B. Comey, United
States Attorney for the Southern District
of New York, New York City, By: Deirdre

A. McEvoy, AUSA, Steven R. Glaser, AUSA, of counsel.

Latham & Watkins, New York City, for Defendant. By: David M. Brodsky, Alexandra A.E. Shapiro, Noreen A. Kelly–Najah, of counsel.

## OPINION

SWEET, District Judge.

Defendant John J. Cassese ("Cassese") moves to: (1) suppress certain statements he made during the course of plea negotiations pursuant to Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410; and (2) dismiss Count Two of the Indictment as legally insufficient. For the reasons stated below, this motion is granted in part.

### Prior Proceedings

Indictment, 03 Cr. 302(RWS) ("Ind."), was filed on March 12, 2002 in two counts. Count One charges Cassese with securities fraud in connection with a tender offer, in violation of 15 U.S.C. §§ 78n(e) and 78ff and 17 C.F.R. § 240.14e–3(a). Count Two charges Cassese with securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b–5 and 18 U.S.C. § 2. On March 17, 2003, Cassese entered a plea of not guilty to both counts. Trial is scheduled to commence on September 15, 2003.

These pretrial motions were heard and marked fully submitted on June 25, 2003.

### The Indictment

According to the Indictment, Cassese was the Chairman and President of Computer Horizons Corporation, a New York corporation with its principal place of business in Mountain Lakes, New Jersey. (Ind.¶¶ 1–2.) Computer Horizons engaged in the business of providing temporary staffing of computer and information technology personnel. (Ind.¶ 1.) The common stock of Computer Horizons was registered with the United States Securities and Exchange Commission (the "SEC") and publicly traded on the NASDAQ National Market System. Id. As Chairman and President of Computer Horizons, Cassese participated in negotiating mergers and acquisitions between Computer Horizons and other companies, including other publicly traded companies. (Ind. ¶ 2.)

On April 12, 1999, Cassese and another representative of Computer Horizons met with a senior manager of Compuware Corporation ("Compuware") to discuss a potential acquisition of Computer Horizons by Compuware. (Ind.¶ 5.) Compuware, a Michigan corporation with its principal place of business in Detroit, Michigan, was also engaged in the business of providing temporary staffing of computer and information technology personnel. (Ind.¶ 3.) After the meeting, negotiations regarding the proposed acquisition continued. (Ind. ¶ 5.)

On or about May 4, 1999, in connection with the ongoing discussions, Compuware sent Cassese and Computer Horizons a confidentiality agreement, which, among other things, sought to prohibit any Computer Horizons employee from trading securities based upon any material, non-public information learned from the discussions. However, neither Cassese, nor anyone else, executed the confidentiality agreement on behalf of Computer Horizons. Additionally, on May 4, 1999, Compuware sent Computer Horizons a letter of intent setting forth the proposed terms of the Compuware acquisition of Computer Horizons. (Ind.¶ 6.)

The Indictment alleges that in or about April and May 1999, while the negotiations between Compuware and Computer Horizons were ongoing, representatives of Compuware met with executives from Data Processing Resources Corp. ("DPRC") to discuss a potential merger of those two companies. On or about May

26, 1999, Compuware advised DPRC that it was interested in acquiring all of the issued and outstanding shares of DPRC through a tender offer of $25 per share, a price substantially above the then-prevailing market price of DPRC. On or about June 2, 1999, DPRC privately advised Compuware that it would accept its $25 offer. (Ind.¶ 7.)

On or about June 21, 1999, Compuware's Chief Executive Officer, Peter Karmanos ("Karmanos"), telephoned Cassese and advised him that Compuware would not acquire Computer Horizons, but rather it would acquire DPRC instead. (Ind.¶ 8.) The Indictment alleges that at the time of this conversation, as Cassese knew, Compuware had not yet publicly announced its proposed acquisition of DPRC. (Ind.¶ 8.)

The following day, on or about June 22, 1999, Cassese telephoned two securities brokers, one of which was located in New York, and placed orders to purchase a total of 15,000 shares of DPRC. Shortly thereafter, Cassese's orders were executed at prices of approximately $13.25 per share. Cassese did not disclose to the purchasers of his shares that he knew material, non-public information from Compuware's Chief Executive Officer that Compuware agreed to acquire DPRC. (Ind.¶ 9.)

On or about June 23, 1999, the Board of Directors of DPRC and Compuware voted to approve Compuware's acquisition of DPRC by tender offer for approximately $24 per share. (Ind.¶ 10.) On or about June 24, 1999, prior to the opening of trading on the NASDAQ stock market, Compuware and DPRC issue a press release publicly announcing that Compuware would acquire DPRC at approximately $24 per share. When trading began, the price of DPRC's stock opened at approximately $23.50 per share, representing an increase of approximately $11.25 per share from the previous day's closing price. (Ind.¶ 11.)

The Indictment further alleges that on or about June 24, 1999, following the public announcements of the tender offer for DPRC, Cassese instructed his securities brokers to sell the 15,000 shares of DPRC stock that Cassese had purchased on or about June 22, 1999. The securities were sold at an average price of $23.31, yielding illegal profits for Cassese of approximately $150,937.50. (Ind.¶ 12.)

### Motion to Suppress

Cassese moves to suppress certain statements made to prosecutors, responsible for this case prior to the filing of the Indictment, during the course of plea discussions. The government concedes that Cassese's statements are inadmissible pursuant to Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410. (Opp. Mem. at 1.) However, the government requests that the Court preclude Cassese's counsel from eliciting testimony or making arguments that directly contradict Cassese's statements.

As decided at the oral argument on June 25, 2003, if the government wishes to offer contrary statements, the Court will hold an *in camera* examination to see if this evidence is offered in good faith. (6/25/03 Tr. at 9.)

### Motion to Dismiss Count Two

#### Legal Standard

Federal Rule of Criminal Procedure 12(b)(2) permits pre-trial consideration of any defense "that the court can determine without a trial of the general issue." While legal issues can be resolved by the court, fact questions raised by an Indictment are the province of the jury. *United States v. Pirro,* 96 F.Supp.2d 279, 283 (S.D.N.Y.1999). "[A] defendant may not challenge a facially valid Indictment prior to trial for insufficient evidence. Instead, a defendant must await a Rule 29 proceeding or the jury's verdict before he

may argue evidentiary sufficiency." *United States v. Kelly*, 91 F.Supp.2d 580, 583 (S.D.N.Y.2000). *See also United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir.1998) ("To the extent that the district court looked beyond the face of the indictment and drew inferences as to the proof that would be introduced by the Government at trial ... we hold that in the circumstances presented, such an inquiry into the sufficiency of the evidence was premature.").

### Securities Fraud

In the present case, Cassese argues that Count Two of the Indictment is insufficient as a matter of law, and that even if all the allegations in the Indictment are proven, they do not establish securities fraud in violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5.

 There are two general theories of liability under Section 10(b) and Rule 10b–5: traditional insider trading and misappropriation. *United States v. O'Hagan*, 521 U.S. 642, 651–52, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997). Traditional insider trading is irrelevant here as the indictment does not allege, and the government does not argue, that Cassese was a corporate insider who bought or sold securities of his corporation's stock based on material, nonpublic information. *See Dirks v. SEC*, 463 U.S. 646, 653, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983); *O'Hagan*, 521 U.S. at 651–52, 117 S.Ct. 2199. Furthermore, Cassese cannot be held liable as a tippee given material, nonpublic information by a tipper, or company insider, since tippee liability is secondary and "attaches only when an insider has breached his fiduciary duty to the shareholders by disclosing the information to the tippee and the tippee knows or should know that there has been a breach." *United States v. Chestman*, 947 F.2d 551, 565 (2d Cir.1991). *See also Dirks*, 463 U.S. at 659, 103 S.Ct. 3255

("[T]he tippee's duty to disclose or abstain is derivative from that of the [tipper's] duty."); *O'Hagan*, 521 U.S. at 663, 117 S.Ct. 2199 ("Absent any violation by the tippers, there [can] be no derivative liability for the tippee."). The indictment nowhere alleges, and the government does not argue, that Karmanos breached his fiduciary duty to Compuware shareholders by disclosing to Cassese that Compuware intended to acquire DPRC.

### Misappropriation

 Thus, the only legal theory for the Section 10(b) charge is misappropriation, and Cassese argues that it is legally deficient. Under misappropriation theory, a person commits fraud "in connection with" a securities transaction, in violation of § 10(b), "when he misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information." *O'Hagan*, 521 U.S. at 652, 117 S.Ct. 2199. Misappropriation liability, therefore, turns on the existence of "a fiduciary duty or similar relationship of trust and confidence" owed to the source of the material, nonpublic information. *Chestman*, 947 F.2d at 566.

Courts have repeatedly emphasized that "a fiduciary duty cannot be imposed unilaterally by entrusting a person with confidential information." *United States v. Chestman*, 947 F.2d 551, 567 (2d Cir.1991). *See also United States v. Reed*, 601 F.Supp. 685, 715 (S.D.N.Y.1985) ("The mere unilateral investment of confidence by one party in the other ordinarily will not suffice to saddle the parties with the obligations and duties of a confidential relationship."); *United States v. Falcone*, 257 F.3d 226, 234 (2d Cir.2001) ("[A] fiduciary duty cannot be imposed unilaterally by entrusting a person with confidential information, and ... a fiduciary relationship, or its functional equivalent, exists only where there is explicit acceptance of a duty of

confidentiality or where such acceptance may be implied from a similar relationship of trust and confidence between the parties.").

In *Chestman*, the Second Circuit defined the necessary elements of a fiduciary relationship and "a similar relationship of trust and confidence"—"the functional equivalent of a fiduciary relationship." *Id.* at 568. The court explained, "Tethered to the field of shareholder relations, fiduciary obligations arise within a narrow, principled sphere." *Id.* at 567. " 'At the heart of the fiduciary relationship' lies 'reliance, and de facto control and dominance.' " *Id.* at 568 (2d Cir.1991) (*quoting United States v. Margiotta*, 688 F.2d 108 (2d Cir.1982)). "The relation exists when confidence is reposed on one side and there is resulting superiority and influence on the other." *Id.* (citations omitted). Furthermore, "[a] fiduciary relationship involves discretionary authority and dependency." *Id.* at 569. *See also Falcone*, 257 F.3d at 234–35 ("Qualifying relationships are marked by the fact that the party in whom confidence is reposed has entered into a relationship in which he or she acts to serve the interests of the party entrusting him or her with such information."). The *Chestman* court also gave examples of "associations" with these characteristics that are "inherently fiduciary": relations "between attorney and client, executor and heir, guardian and ward, principal and agent, trustee and trust beneficiary, and senior corporate official and shareholder." *Chestman*, 947 F.2d at 568.

■ According to the Indictment, Cassese and Karmanos were competitors engaged in negotiations for a possible business combination involving their respective companies (Indictment ¶¶ 5–8). Cassese and Karmanos were thus not inherent fi-

duciaries, but rather potential arms-length business partners. Furthermore, the Indictment does not allege that Cassese and Karmanos had a long-standing relationship or that they regularly shared confidences. In fact, the Indictment does not even allege that Cassese spoke to Karmanos before June 21, 1999. This is very far from a relationship marked by "de facto control" and "dominance" or entailing "discretionary authority and dependency." *Chestman*, 947 F.2d at 568–69.[1]

■ The instant case bears a close resemblance to *Kim*, where the court rejected the existence of a fiduciary relationship between two CEOs who shared confidences as members of the Young Presidents Organization, a social and professional club. The Court explained that "*Chestman* requires the influence of a superior or dominating nature—not the 'influence' one peer might exert on another." *United States v. Kim*, 184 F.Supp.2d 1006, 1011 (N.D.Cal.2002). Relationships found to predicate criminal liability are "characterized by superiority, dominance, or control," and they "are not relationships among equals." *Id.*

■ Thus, the key question is whether the relationship between Cassese and Karmanos is "best characterized as an equal relationship between peers or as a relationship involving a degree of dominance." *Kim*, 184 F.Supp.2d at 1011. Fiduciary-like dominance "arises out of some combination of 1) disparate knowledge and expertise, 2) a persuasive need to share confidential information, and 3) a legal duty to render competent aid." *Id.* In the present case, none of these elements exist. Cassese was under no legal duty to aid Karmanos, Karmanos did not turn to Cassese for advice or for the use of his particular

---

**1.** It is interesting to note that the SEC determined it inappropriate to charge Cassese with a Section 10(b) offense in the civil context.

knowledge and skills, the two men shared "similar levels of achievement, experience, and expertise," and there was "no persuasive need" for Karmanos to tell Cassese about Compuware's acquisition of DPRC. *Id.* at 1012.

■ Moreover, the relationship between Cassese and Karmanos is weaker than in *Kim.* In the *Kim* case, the parties signed an express confidentiality agreement and regularly shared business confidences. As a condition of club membership, all members were required to comply with a written "Confidentiality Commitment," which emphasized the need to hold all information shared by members in "absolute confidence." *Kim,* 184 F.Supp.2d at 1008. Here, neither Cassese, nor anyone else from Computer Horizons, executed Compuware's confidentiality agreement. (Ind.¶ 6.) "While acceptance [of a duty of confidentiality] may be implied, it must be implied from a pre-existing fiduciary-like relationship between the parties." *Chestman,* 947 F.2d at 571. The Indictment alleges that Karmanos and Cassese took part in only a single telephone conversation. Contrary to the government's assertions, the Indictment alleges no facts that show that Cassese and Karmanos have a "history, pattern, or practice of sharing confidences." 17 C.F.R. § 240.10b–5

The present case is also similar to *Walton v. Morgan Stanley & Co. Inc.,* 623 F.2d 796 (2d Cir.1980). In *Walton,* the Second Circuit held that when two corporations' management were "at all times responsible for different interests, and . . . had no relationship to each other before or other than in the acquisition discussions," they "must be presumed to have dealt, absent evidence of an extraordinary relationship, at arm's length." *Id.* at 798. The fact that information exchanged between the two parties is confidential does nothing to change their relationship from arms-length into a fiduciary relationship. *Id.* at 799.

This case is unlike *Reed* and *Yun,* which address the circumstances under which familial relations can give rise to fiduciary-like obligations for purposes of Section 10(b). *Reed,* for instance, involved a father-son relationship, characterized by a history of confidential business communications. *United States v. Reed,* 601 F.Supp. 685 (S.D.N.Y.1985). In discussing *Reed,* the Second Circuit later declared:

> [W]e limit *Reed* to its essential holding: the repeated disclosure of business secrets between family members may substitute for a factual finding of dependence and influence and thereby sustain a finding of the functional equivalent of a fiduciary relationship. We note, in this regard, that *Reed* repeatedly emphasized that the father and son "frequently discussed business affairs."

*Chestman,* 947 F.2d at 569 (*quoting Reed,* 601 F.Supp. at 690).

In *SEC v. Yun,* the Eleventh Circuit found a fiduciary relationship between a husband and wife where they had "a history or pattern of sharing business confidences," and the wife "explicitly accepted the duty to keep in confidence the business information she received." 327 F.3d 1263, 1274 (11th Cir.2003). This is very different from the present case where there is no familial relationship, no explicit acceptance of the duty of confidentiality,[2] and no history of shared confidences.

The *Singer* case, cited by the government, is further inapplicable here. In *SEC v. Singer,* in addition to allegations of attorney client affiliations, the parties also shared "a *very close personal relationship,*

---

**2.** In fact, Cassese's refusal to execute the Confidentiality Agreement can even be seen as a rejection of such a duty.

demonstrated by dinners together, a common vacation, and a pattern of socializing on a regular basis." 786 F.Supp. 1158, 1170 (S.D.N.Y.1992) (emphasis in original). One of the parties even went so far as to characterize their relationship as "so close that it was almost a stream of consciousness." *Id.* The court emphasized the defendant's *"superiority and influence"* in holding that the "attorney-client association intertwined with a confidential relationship" created a fiduciary duty. *Id.* (emphasis in original). In the present case, there is neither an attorney-client association, nor a close relationship, characterized by superiority and influence.

### Conclusion

The motion to dismiss Count Two of the Indictment is thus granted.

It is so ordered.