[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 16, 2003
THOMAS K. KAHN
CLERK

No. 01-14490

D.C. Docket No. 99-00117-CV-ORL-22A

SECURITIES AND EXCHANGE COMMISSION,

                                        Plaintiff-Appellee,

                        versus

DONNA YUN,
JERRY BURCH,

                                        Defendants-Appellants.

Appeals from the United States District Court
for the Middle District of Florida

**(April 16, 2003)**

Before TJOFLAT and COX, Circuit Judges, and HANCOCK*, District Judge.

_____

* Honorable James H. Hancock, U.S. District Judge for the Northern District of Alabama, sitting by designation.

TJOFLAT, Circuit Judge:

This is an insider trading case, brought by the Securities and Exchange Commission ("SEC") under section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and (SEC) Rule 10b-5, 17 C.F.R. § 240.10b-5, against Donna Yun and Jerry Burch. Answering special verdicts, a jury found that the defendants had "violated Section 10(b)" under the "misappropriation theory" of liability. Acting on those verdicts, the district court entered judgment against the defendants, holding them "jointly liable" for $269,000, the profits generated by the prohibited trading, plus prejudgment interest, and individually liable for a penalty in the sum of $1,000. SEC v. Yun, 148 F. Supp. 2d 1287 (M.D. Fla. 2001).[1]

Yun and Burch now appeal, contending that the district court erred in denying their motions for judgment as a matter of law and, alternatively, that the court erred in instructing the jury on elements of the misappropriation theory of liability.[2]

---

[1] The district court's opinion recites that the court imposed a $100,000 penalty on each defendant. The court did so initially, but reduced the penalty to $1,000, apparently on its own initiative.

[2] Yun and Burch also contend that the court erred in denying their motions for summary judgment. Because, in our view, the evidence presented on summary judgment and on motion for judgment as a matter of law was the same in all material respects, our conclusion that the court did not err in denying the motions for judgment as a matter of law disposes of the summary

I.[3]

A.

Donna Yun is married to David Yun, the president of Scholastic Book Fairs, Inc., a subsidiary of Scholastic Corporation ("Scholastic"), a publisher and distributor of children's books whose stock is quoted on the NASDAQ National Market System and whose option contracts are traded on the Chicago Board Options Exchange. On January 27, 1997, David attended a senior management retreat at which Scholastic's chief financial officer revealed that the company would post a loss for the current quarter, and that before the quarter ended, the company would make a public announcement revising its earnings forecast downward. He cautioned the assembled executives not to sell any of their Scholastic holdings until after the announcement, which would likely result in a decline in the market price of Scholastic shares, and warned them to keep the matter confidential. Approximately two weeks later, on February 13, Scholastic's chief financial officer informed David that the negative earnings announcement would be made on February 20.

---

judgment issues.

[3] We recite the facts in the light most favorable to the non-movant, here the SEC, as we are required to do when reviewing the denial of a motion for summary judgment or judgment as a matter of law. See Hyman v. Nationwide Mut. Fire Ins. Co., 304 F.3d 1179, 1185 (11th Cir. 2002).

Over the weekend of February 15-16, David and Donna discussed a statement of assets that he had provided her in connection with their negotiation of a post-nuptial division of assets. David explained to Donna that he had assigned a $55 value to his Scholastic options listed on the asset statement, even though Scholastic's stock was then trading at $65 per share, because he believed that the price of the shares would drop following Scholastic's February 20 earnings announcement. He also told her not to disclose this information to anyone else, and she agreed to keep the information confidential.[4]

The following Tuesday, February 18, Donna went to her place of work – a real estate office located in a nearby housing development.[5] The office was a small sales trailer, approximately eleven by thirteen feet, that Donna shared with other real estate agents, including Jerry Burch. During the late morning or early afternoon, Donna telephoned Sam Weiss – the attorney assisting her in negotiating the post-nuptial division of assets – from her office to discuss David's statement of assets. While she was speaking to Weiss, Burch entered the office to gather materials for a real estate client. Standing three to four feet from Donna, Burch

---

[4] David anticipated that Donna would discuss this information with her attorney, but assumed her attorney would keep the information confidential.

[5] The Yun's lived in an Orlando, Florida suburb. David's office was in Lake Mary. Donna's office was in Longwood.

heard her tell Weiss what David had said about Scholastic's impending earnings announcement and that David expected the price of the company's shares to fall. As he testified at trial, Burch did not learn enough from what he overheard to feel "comfortable" trading in Scholastic's stock.

That evening, Donna and Burch attended a real estate awards banquet at the Isleworth Country Club. Donna, Burch, and another agent, Maryann Hartmann, carpooled to the reception. All three stayed at the reception for three hours and left together.

The next morning Burch called his broker and requested authority to purchase put options in Scholastic.[6] When the broker advised Burch that he knew of no new information indicating the price of Scholastic stock would decline, Burch stated that based on information he had obtained at a cocktail party, he nonetheless wanted to purchase the put options. The broker warned Burch of the risks of trading in options, and cautioned him about insider trading prohibitions.[7] Despite these warnings, between the afternoon of February 19 and midday on February 20, Burch purchased $19,750 in Scholastic put options, which was equal

---

[6] A put option is an option contract that gives the holder of the option the right to sell a certain quantity of an underlying security to the writer of the option, at a specified price up to a specified date. The value of a put increases as the price of the stock decreases.

[7] The broker, James Whitley, advised Burch that purchasing a put option is "just a bet" that could result in the loss of his entire investment.

to two-thirds of his total income for the previous year and nearly half the value of his entire investment portfolio.[8]

After the stock market closed on February 20, Scholastic announced that its earnings would be well below the analysts' expectations. When the market opened the next day, the price of Scholastic shares had dropped approximately 40 percent to $36 per share. Burch then sold his Scholastic puts, realizing a profit of $269,000 – a 1,300 percent return on his investment. Within hours, the SEC commenced an investigation of Burch's trades, to determine whether insider trading had occurred. The investigation culminated in the present lawsuit. In a one-count complaint, the SEC alleged that Donna and Burch had violated section 10(b) of the Exchange Act and Rule 10b-5,[9] and sought both legal and equitable

---

[8] Some of the put options Burch purchased expired within two days. The remaining options expired within a month.

[9] In pertinent part, section 10(b) of the Exchange Act provides:
> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange –
> . . .
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the . . . [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Additional language was added to this subsection in 2000 but is irrelevant to the issues before us today.

relief.[10]

B.

There are two theories of insider trading liability: the "classical theory" and the "misappropriation theory."  The classical theory imposes liability on corporate "insiders" who trade on the basis of confidential information obtained by reason of their position with the corporation.[11]  The liability is based on the notion that a corporate insider breaches "a . . . [duty] of trust and confidence" to the shareholders of his corporation.  <u>United States v. O'Hagan</u>, 521 U.S. 642, 652, 117

---

Pursuant to its § 10(b) rulemaking authority, the SEC adopted Rule 10b-5, that provides, in pertinent part:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
> (a) To employ any device, scheme, or artifice to defraud, [or]
> . . .
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

[10]  In referring to the SEC's complaint, we actually refer to the SEC's amended complaint.  As legal relief, the complaint sought the imposition of civil penalties pursuant to section 21A(a) of the Exchange Act.  As equitable relief, the complaint asked for an order enjoining the defendants from further violations of § 10(b) and Rule 10b-5, directing them to disgorge the profits generated by Burch's trades, and directing Burch to pay prejudgment interest.

[11]  In this opinion, the words "confidential information" mean "material, nonpublic information."

7

S. Ct. 2199, 2207, 138 L. E. 2d 724 (1997). The misappropriation theory, on the other hand, imposes liability on "outsiders" who trade on the basis of confidential information obtained by reason of their relationship with the person possessing such information, usually an insider.[12] The liability under the latter theory is based on the notion that the outsider breaches "a duty of loyalty and confidentiality" to the person who shared the confidential information with him. Id. at 652, 117 S. Ct. at 2207.[13]

Not only are the insider and the outsider forbidden from trading on the basis of the confidential information they have received, they are forbidden from "tipping" such information to someone else, a "tippee," who, being fully aware that the information is confidential, does the trading.[14] In other words, the insider and outsider are forbidden from doing indirectly what they are forbidden from

---

[12] This theory "holds that a person commits fraud 'in connection with' a securities transaction, and thereby violates § 10(b) and Rule 10b-5, when he misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information." O'Hagan, 521 U.S. at 652, 117 S. Ct. at 2207. A person's "undisclosed, self-serving use of a principal's information to purchase or sell securities" is held to constitute a breach of duty of loyalty and confidentiality. Id.

[13] We think that "a duty of loyalty and confidentiality" is synonymous with "a duty of trust and confidence," and, accordingly, use the expressions interchangeably.

[14] To join a co-venture to exploit the confidential information, and thereby subject one-self to insider trading liability, a tippee must know, or have reason to know, that the tipper disclosed the information in breach of a fiduciary duty. See Dirks v. SEC, 463 U.S. 646, 660 n.19, 103 S. Ct. 3255, 3264 n.19, 77 L. E. 2d 911 (1983); see also United States v. Falcone, 257 F.3d 226, 232 (2d Cir. 2001).

doing directly.[15]   To establish liability, however, the SEC need not show that the tippee actually traded for the tipper and gave him the profits of the trades; all the SEC needs to show is that the tipper received a "benefit," directly or indirectly, from his disclosure.  See Dirks, 463 U.S. at 659-62, 103 S. Ct. at 3264-65.

This is a tipper-tippee case.  The SEC prosecuted it under the "misappropriation theory" of insider trading liability.  Its complaint alleged that Donna was an outsider who had a fiduciary relationship with David,[16] and that she breached that duty when she divulged to Burch confidential information, which David had given her, "for her direct and/or indirect benefit because of her business relationship and friendship with . . . Burch."  Under these circumstances, the complaint alleged, Donna was liable under section 10(b) of the Exchange Act and

---

[15]  The seminal decision addressing tipper and tippee liability is Dirks, 463 U.S. at 646, 103 S. Ct. at 3255.  In an action brought by the SEC under the classical theory, the Supreme Court explained that tippee liability is based on a person's role as a "participant after the fact" in the breach of duty that occurred when the tipping insider disclosed the information.  Id. at 659 (quoting United States v. Chiarella, 445 U.S. 222, 230 n.12, 100 S. Ct. 1108, 1116 n.12, 63 L. E. 2d 348 (1980)).  That is, tippee liability arises only when the tippee joins his tipper in a co-venture to exploit the confidential information.  If the tipper is found not to have breached a duty, then the tippee cannot be held liable.  Courts which have considered the question of tipper and tippee liability in cases brought under the misappropriation theory have assumed that the approach taken in cases brought under the classical theory of liability applies.  See, e.g., SEC v. Maio, 51 F.3d 623, 634 (7th Cir. 1995).

[16]  The SEC's complaint used the words "duty of trust and confidence" to describe Donna's fiduciary duty to David – that she would not share the confidential information he gave her about Scholastic's revised earnings forecast with anyone (except her attorney).  In this opinion, we treat the quoted words and the term "fiduciary duty" as synonymous.

9

Rule 10b-5 to disgorge the profits Burch realized from the put options trades. Because Burch knew of Donna's breach of her fiduciary duty to David, but nonetheless traded on the confidential information she gave him, he, too, was liable under § 10(b) and Rule 10b-5.

The separate answers filed by Donna and Burch admitted that Burch engaged in the alleged put options transactions, but denied any violations of § 10(b) or Rule 10b-5. In short, the answers denied that a fiduciary relationship existed between the Yuns and asserted, alternatively, that if Donna owed David a fiduciary duty not to disclose Scholastic's financial situation, she did not breach it because she did not expect to benefit directly or indirectly from the disclosure to Burch.[17]

The case was tried to a jury on the issues framed by the complaint and these answers. At the close of the evidence, the defendants moved for judgment as a matter of law pursuant to Rule 50(a) of the Federal Rules of Civil Procedure. The court took the motions under advisement. After the jury returned its verdicts, the defendants renewed their motions pursuant to Rule 50(b), reiterating the grounds stated in their previous motions: (1) the evidence failed to establish a

---

[17] The defendants' answers also contained the affirmative defense of failure to state a claim for relief, which the court never addressed.

fiduciary relationship between David and Donna Yun concerning Scholastic's financial earnings; and (2) if such a relationship existed, Donna did not breach it by disclosing the earnings information to Burch for the purpose of obtaining a direct or indirect benefit.[18]   The court denied their motions.  SEC v. Yun, 130 F. Supp. 2d 1348 (M.D. Fla. 2001).

The defendants now appeal, attacking the district court's judgment on two grounds.  First, they contend, as they did in moving for judgment as a matter of law, that the evidence was insufficient to establish a violation of § 10(b) or Rule 10b-5.  Second, and alternatively, they contend that the district court erred in instructing the jury on essential elements of the SEC's claims.  Such error, they maintain, is not harmless; therefore, they should be afforded a new trial.  We address these two grounds in order.

II.

---

[18]  Alternatively, the defendants moved the district court to grant them a new trial.  Fed. R. Civ. P. 59(a) provides, in pertinent part: "A new trial may be granted . . . in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States . . . ."  The defendants' motions for new trial specified no reason(s) for granting a new trial in this case.  Moreover, nowhere in their briefs to us do the defendants argue that the district court abused its discretion in denying their motions for new trial.  We therefore make no further mention of the defendants' motions for a new trial. Instead, we focus our attention to the issues the defendants have raised in their briefs: whether the district court erred in denying their Rule 50(b) motions for judgment as a matter of law, and whether the court erred in charging the jury with respect to elements of the SEC's claims under § 10(b) and Rule 10b-5.

11

A.

In assessing the district court's ruling on appellants' motions for judgment as a matter of law, we first consider whether Donna owed David a duty of loyalty and confidentiality not to disclose the revised earnings information he had received in confidence.

As stated supra, to prevail in an insider trading case, the SEC must establish that the misappropriator breached a duty of loyalty and confidentiality owed to the source of the confidential information. Certain business relationships, such as attorney-client[19] or employer-employee,[20] clearly provide the requisite duty of loyalty and confidentiality. On the other hand, it is unsettled whether non-business relationships, such as husband and wife, provide the duty of loyalty and confidentiality necessary to satisfy the misappropriation theory. The leading case on when a duty of loyalty and confidentiality exists in the context of family members – the case relied on by the parties and the district court for the elements of a confidential relationship – is United States v. Chestman, 947 F.2d 551 (2d Cir. 1991) (en banc).

In a divided en banc decision, the Second Circuit held that marriage alone

---

[19] See, e.g., United States v. O'Hagan, 521 U.S. 642, 647-49, 117 S. Ct. 2199, 2205, 138 L. E. 2d 724 (1997).

[20] See, e.g., United States v. Carpenter, 791 F.2d 1024, 1028 (2d Cir. 1986).

does not create a relationship of loyalty and confidentiality. Id. at 568. Either an "express agreement of confidentiality" or the "functional equivalent" of a "fiduciary relationship" must exist between the spouses for a court to find a confidential relationship for purposes of § 10(b) and Rule 10b-5 liability. Since the spouses had not entered into a confidentiality agreement, the court turned its focus to determining what constitutes a fiduciary relationship or its functional equivalent. "At the heart of the fiduciary relationship," the court declared, "lies reliance, and de facto control and dominance." Id. at 568 (citations and internal quotation marks omitted). Having so concluded, the court explained that the functional equivalent of a fiduciary relationship "must share these qualities." Id. at 569. Applying the requisite qualities of reliance, control, and dominance to the husband and wife relationship at hand, the Chestman majority held that no fiduciary relationship or its functional equivalent existed. The spouses' sharing and maintaining of "generic confidences" in the past was insufficient to establish the functional equivalent of a fiduciary relationship. Id. at 571. Accordingly, the court decided that the defendants were not subject to sanctions for insider trading violations.

A lengthy dissent by Judge Winter, joined by four judges, took issue with the narrowness in which the majority would find a relationship of loyalty and

13

confidentiality amongst family members, pointing out that under the majority's approach, the disclosure of sensitive corporate information essentially could be "avoided only by family members extracting formal, express promises of confidentiality." Id. at 580. Such an approach, in the view of the dissent, was "unrealistic in that it expects family members to behave like strangers toward each other." Id. Moreover, the normal reluctance to recognize obligations based on family relationships – the concern that intra-family litigation would exacerbate strained relationships and weaken the sense of mutual obligation underlying family relationships – was inapplicable in insider trading cases because the suits are brought by the government. See id. at 580. Given the circumstances of the case, the dissent concluded that a confidential relationship existed between the husband and wife which gave rise to a duty of loyalty and confidentiality on his part not to disclose the sensitive information.[21]

We are inclined to accept the dissent's view that the Chestman decision too narrowly defined the circumstances in which a duty of loyalty and confidentiality is created between husband and wife. We think that the majority, by insisting on

---

[21] In the context of family-controlled businesses, the dissent noted, "it is inevitable that from time to time normal familial interactions will lead to the revelation of confidential corporate matters to various family members[, and] the very nature of familial relationships may cause the disclosure of corporate matters to avoid misunderstandings among family members or suggestions that a family member is unworthy of trust." Chestman, 947 F.2d at 579.

14

either an express agreement of confidentiality or a strictly defined fiduciary-like relationship, ignored the many instances in which a spouse has a reasonable expectation of confidentiality.[22]  In our view, a spouse who trades in breach of a

reasonable and legitimate expectation of confidentiality held by the other spouse sufficiently subjects the former to insider trading liability.  If the SEC can prove that the husband and wife had a history or practice of sharing business confidences, and those confidences generally were maintained by the spouse receiving the information, then in most instances the conveying spouse would have a reasonable expectation of confidentiality such that the breach of the expectation would suffice to yield insider trading liability.  Of course, a breach of an agreement to maintain business confidences would also suffice.[23]

---

[22] We note that the Chestman majority emphasized that it was determining what constitutes a fiduciary relationship in the context of a criminal case.  The majority recognized that "equity has occasionally established a less rigorous threshold for a fiduciary-like relationship in order to right civil wrongs arising from non-compliance with the statute of frauds," but decided that "an elastic and expedient definition of confidential relations, i.e., relations of trust and confidence, . . . has no place in the criminal law."  Id. at 569-70.  It appears, therefore, that the majority intimated that it would expand the definition of a duty of loyalty and confidentiality in the civil context.  Even so, many courts have employed Chestman's narrow approach to determining the existence of a duty of loyalty and confidentiality to civil actions.  See, e.g., SEC v. Falbo, 14 F. Supp. 2d 508, 523 (S.D.N.Y. 1998).  Without commenting on the majority's analysis in Chestman as it pertains to the criminal context, we decline to follow its analysis in the civil context.

[23] Our conclusion is bolstered by statements the SEC has made since the trading in this case took place.  SEC Rule 10b5-2, which became effective August 24, 2000, defines three non-exclusive circumstances "in which a person has a duty of trust or confidence for purposes of the

15

For purposes of this case, then, the existence of a duty of loyalty and confidentiality turns on whether David Yun granted his wife, Donna, access to confidential information in reasonable reliance on a promise that she would safeguard the information. See SEC v. Sargent, 229 F.3d 68, 75 (1st Cir. 2000) ("[T]he misappropriation theory premises liability on a fiduciary-turned-trader's deception of those who entrusted him with access to confidential information.")

---

'misappropriation' theory of insider trading." 17 C.F.R. § 240.10b5-2 (2002) (preliminary note). The three situations are as follows:

> (1) Whenever a person agrees to maintain information in confidence;
> (2) Whenever the person communicating the material nonpublic information and the person to whom it is communicated have a history, pattern, or practice of sharing confidences, such that the recipient of the information knows or reasonably should know that the person communicating the material nonpublic information expects that the recipient will maintain its confidentiality; or
> (3) Whenever a person receives or obtains material nonpublic information from his or her spouse, parent, child, or sibling, provided, however, that the person receiving or obtaining the information may demonstrate that no duty of trust or confidence existed with respect to the information, by establishing that he or she neither knew nor reasonably should have known that the person who was the source of the information expected that the person would keep the information confidential, because of the parties' history, pattern, or practice of sharing and maintaining confidences, and because there was no agreement or understanding to maintain the confidentiality of the information.

Rule 10b5-2, 17 C.F.R. § 240.10b5-2 (2002).

While the SEC's new rule goes farther than we do in finding a relationship of trust and confidence (e.g., the new rule creates a presumption of a relationship of trust and confidentiality in the case of close family members), the following language on the background of the rule supports the conclusion we reach: "[T]he Chestman majority's approach does not fully recognize the degree to which parties to close family and personal relationships have reasonable and legitimate expectations of confidentiality in their communications." Proposed Rules, Securities and Exchange Commission, Selective Disclosure and Insider Trading, Dec. 28, 1999, 64 Fed. Reg. 72590-01, 72602.

(citing O'Hagan, 521 U.S. at 652, 117 S. Ct. at 2199). If the SEC presented evidence that David and Donna had a history or pattern of sharing business confidences, which were generally kept, then Donna could have been found by the jury to have breached a duty of loyalty and confidentiality by disclosing to Burch the information regarding Scholastic's upcoming earnings announcement. Similarly, if the SEC presented evidence that Donna had agreed in this particular instance to keep the information confidential, then Donna could have been found to have committed the necessary breach of a duty of loyalty and confidentiality.

We conclude that the SEC provided sufficient evidence both that an agreement of confidentiality and a history or pattern of sharing and keeping of business confidences existed between David and Donna Yun such that David could have reasonably expected Donna to keep confidential what he told her about Scholastic's pending announcement. First, the SEC presented evidence that Donna explicitly accepted the duty to keep in confidence the business information she received. She testified that she considered the information confidential because, "David always told me, anything that he talks to me in regards to the company is confidential and can't go past he or I." That she fully understood and agreed to the understanding of confidentiality is further manifested by the fact that she declined to disclose any information about David's company to her

17

attorney until she had "absolute certainty that there was confidentiality with everything [she] was sharing with him." Second, both David and Donna testified that David repeatedly shared confidential information about Scholastic with Donna, including information regarding its sales goals. This certainly qualified as a history or pattern of sharing business confidences. Overall, the SEC presented evidence upon which a jury could find that a duty of loyalty and confidentiality existed between David and Donna Yun; the SEC therefore established the first element of a "misappropriation theory" claim.

B.

Having reached this conclusion, we turn to the question of whether the evidence was sufficient to show that Donna breached her duty to David. According to the allegations of the complaint, the answer to this question depends on whether Donna deliberately communicated the confidential information to Burch "for her direct and/or indirect benefit because of her business relationship and friendship with . . . Burch." The SEC contends – contrary to the position it assumed in its complaint – that it did not have to prove that Donna divulged the information for her own benefit; all it had to show was that Donna acted with

"severe recklessness."[24]   According to the SEC, the "intent to benefit" element only applies in cases brought under the classical theory of liability; the element has no application in cases brought under the misappropriation theory of liability. In other words, whether Donna expected to benefit from the disclosure of the confidential information is irrelevant.

Which position is correct – the one the SEC took in its complaint and the appellants essentially take in this appeal or the one the SEC advances now – is an issue we have not been called upon to decide.  Several district courts have addressed the issue, though, with some requiring an expected benefit[25] and others holding that no showing of an expected benefit is necessary.[26]  None of these

---

[24] The SEC's initial complaint was dismissed for failure to state a claim on which relief could be granted.  In its order dismissing the complaint, the district court informed the SEC that if it elected to file an amended complaint, "it should state the facts supporting its [allegation] that Donna Yun acted for her direct or indirect benefit when she disclosed the confidential information related to her by her husband."  The SEC filed an amended complaint which added such facts.  The addition consisted of two paragraphs outlining the "[R]elationship between Donna Yun and Jerry Burch"; a clause explaining that Donna expected a benefit "because of her business relationship and friendship with Jerry Burch as discussed in . . . [the two added paragraphs]"; and a clause explaining that Donna was aware that Burch would trade on the confidential information "based among other things, on their regular discussions concerning investments and the nature of the information she gave [him]."  The amended complaint contained the latter clause in response to the district court's announced view that O'Hagan required that, to be held liable under § 10(b), a tipper had to anticipate that the tippee would trade on the basis of the divulged confidential information.

[25] See, e.g., SEC v. Trikilis, Fed. Sec. L. Rep. (CCH) ¶ 97,015, at 94,462 (C.D. Cal. July 28, 1992), vacated on other grounds, Fed. Sec. L. Rep. (CCH) ¶97,375, at 95,981 (C.D. Cal. Jan. 22, 1993).

[26] See, e.g., SEC v. Willis, 777 F. Supp. 1165, 1172 n.7 (S.D.N.Y. 1991).  The First Circuit noted the disagreement on whether a showing of a misappropriator benefit is necessary,

courts, however, gave the issue more than perfunctory thought. After considering the policies underpinning the insider trading rules, we are led to the conclusion that the SEC must prove that a misappropriator expected to benefit from the tip.

The origin of the benefit requirement is the Supreme Court's decision in Dirks v. SEC, 463 U.S. 646, 103 S. Ct. 3255, 77 L. Ed. 2d 911 (1983). Addressing a case brought under the classical theory of insider trading liability, the Supreme Court held that for a tippee to be liable, the tipper (a corporate insider) would have to intend to benefit personally from his disclosure of the confidential information to the tippee. The Supreme Court explained:

> Whether disclosure is a breach of duty therefore depends in large part on the purpose of the disclosure. . . . Thus, the test is whether the insider personally will benefit, directly or indirectly, from his disclosure. Absent some personal gain, there has been no breach of duty to stockholders. And absent a breach by the insider, there is no . . . [tippee] breach.

Id. at 662, 103 S. Ct. at 3265. The Court went on to recognize that the gain does not always have to be pecuniary. A reputational benefit that translates into future earnings, a quid pro quo, or a gift to a trading friend or relative all could suffice to show that the tipper personally benefitted. Id. at 663-64, 103 S. Ct. at 3266.

---

but avoided weighing in on the issue. See Sargent, 229 F.3d at 77. The First Circuit did observe, however, that the Second Circuit in United States v. Libera, 989 F.2d 596, 600 (2d Cir. 1993) "strongly implied" there is no benefit requirement. Id.

20

Since the insiders (tippers) in <u>Dirks</u>, who disclosed the confidential information, did not do so for monetary benefit or to make a gift of valuable information, they did not personally gain, and the Court concluded that they and the tippees were not subject to insider trading liability. <u>Id.</u> at 667, 103 S. Ct. at 3267-68.

The SEC submits that an analysis of the rationale behind <u>Dirks</u>'s tipper benefit requirement demonstrates that the benefit requirement has no application in misappropriation cases. The SEC's argument proceeds in two steps. First, the SEC points out that the benefit requirement is inextricably linked to determining whether an insider has breached a duty to corporate shareholders. Second, the SEC notes that the distinguishing feature of misappropriation theory cases is that the outsider owes no fiduciary duty to the corporate shareholders. Put together, the SEC contends, it is unnecessary in misappropriation cases that it show that an outsider intended to benefit from his disclosure; since outsiders owe no duty to corporate shareholders to begin with, applying the <u>Dirks</u> test to determine if there was a breach of a duty to those same shareholders would be nonsensical.

We recognize the plausibility of the SEC's logic, but are not persuaded – mainly because it constructs an arbitrary fence between insider trading liability based upon classical and misappropriation theories. In other words, we think the SEC is unduly dichotomizing the two theories of insider trading liability. The

21

SEC's approach essentially would allow the SEC and the courts to ignore precedent involving the classical theory of liability whenever the SEC brings its actions under a misappropriation theory, and vice versa.[27]  The Supreme Court, however, has indicated that we should attempt to synthesize, rather than polarize, insider trading law.  See O'Hagan, 521 U.S. at 652, 117 S. Ct. at 2207 (stressing that the two theories "are complimentary, each addressing efforts to capitalize on nonpublic information through the purchase or sale of securities").  Our goal should be like that of the Court in O'Hagan, which sought to explain how the two theories work together to promote the policies underlying the securities laws.  We believe – as will be explained below – that requiring the SEC to establish that the misappropriator intended to benefit from his tip will develop consistency in insider trading caselaw.

First, we note that there is no reason to distinguish between a tippee who receives confidential information from an insider (under the classical theory) and a tippee who receives such information from an outsider (under the misappropriation theory).  In either case, the tippee is under notice that he has

---

[27]  The dichotomization of insider trading liability based on the classical and misappropriation theories has grown over the last decade, with the SEC utilizing the misappropriation theory with increasing regularity.  We disagree with the way the SEC and several courts have come to put insider trading cases in separate and discrete classical and misappropriation boxes.  Congress did not intend to create a scheme of law that depends on the label or theory under which the SEC brings its case.

22

received confidential information through an improper breach of a duty of loyalty and confidentiality. And should the tippee nonetheless trade on the confidential information, his potential liability would not vary according to the theory – classical or misappropriation – under which the case is prosecuted. Finally, the harm to the securities market from such trading would not differ depending on whether the tippee received the confidential information from an insider or an outsider; the integrity of, and investor confidence in, the securities markets are undermined by either method of insider trading. See id. at 658-59, 117 S. Ct. at 2210.

Given that the position of a tippee is the same whether his tipper is an insider or an outsider, it makes "scant sense" for the elements the SEC must prove to establish a § 10(b) and Rule 10b-5 violation depend on the theory under which the SEC chooses to litigate the case. See id. at 659, 117 S. Ct. at 2210-11. The tippee's liability should be determined under the same principles. And for better or worse, the Supreme Court has required that the only way to taint a tippee with liability for insider trading is to find a co-venture with the fiduciary,[28] and that co-venture exists only if the tipper intends to benefit.[29] To equalize the

---

[28] See supra part I.B.

[29] As discussed above, explicit in Dirks's benefit requirement is that a tippee's liability hinges on the tipper's expectation of a benefit. The SEC's position that the benefit requirement is inextricably linked to the insider's duty to corporate shareholders, therefore, while accurate, is

position of tippees under both theories of liability, therefore, it is necessary to require an outsider who tips to have intended to benefit by his tip.

Requiring an intent to benefit regardless of the theory of insider trading liability also serves to equalize the positions of tippers. Since under both theories of liability the tipper is breaching a duty of loyalty and confidentiality by disclosing confidential information, and since the harm to marketplace traders is identical under either breach, it again makes "scant sense" to impose liability more readily on a tipping outsider who breaches a duty to a source of information than on a tipping insider who breaches a duty to corporate shareholders.

Nevertheless, the SEC urges us to hold that the breach by an outsider is unique from a breach by an insider. In the SEC's view, there is no need to show that the misappropriating outsider intended to benefit. A breach of duty to the

---

incomplete. The benefit requirement is also inextricably linked to the tippee's duty. As one commentator stated regarding the Dirks benefit requirement:

> This portion of the Court's opinion merges a discussion of the necessary state of mind for tippee liability (a scienter concept) with a discussion of the nature of the breach necessary to create tipper liability. One can read the opinion in two ways: (1) the personal benefit requirement is imposed because it provides an objective test for determining whether there has been the requisite notice to the tippee, or (2) the personal benefit requirement is imposed because it states the only situation in which the insider has contravened the policy underlying the abstain or disclose rule, that of avoiding unjust enrichment.

Donald C. Langevoort, Insider Trading Regulation, Enforcement, and Prevention § 4:3 n.7 (2002).

principal occurs when the outsider makes unauthorized disclosure of the confidential information in a way that harms the principal; the harm done to the principal constitutes a breach – whether or not the outsider intends to "profit" from the unauthorized disclosure. We conclude, however, that no good reason exists to treat the two types of breaches differently. Under the common law, a corporate insider breaches a duty of loyalty and confidentiality by disclosing confidential information (rather than trading or tipping on that information) just as much as a misappropriating outsider who discloses the information. And the "harm" to corporate shareholders under the classical theory could be just as – if not more – egregious than the harm to the source of the information under the misappropriation theory. Yet, the Supreme Court in <u>Dirks</u> held that such a disclosure is insufficient to constitute a "breach" for purposes of imposing classical insider trading liability;[30] for there to be a "breach," the tipping insider must act with the goal of benefitting personally. To equate the positions of tippers, we find it appropriate to require the SEC to show that a misappropriating outsider expected to benefit from the disclosure.[31] Mere disclosure by itself is

---

[30] By insisting on an intent to benefit, the Supreme Court indicated that the common law principles of fiduciary duty were not to be adhered to strictly in the insider trading context. After all, an "intent to benefit" is clearly not an essential element of a case against a fiduciary under the common law.

[31] To the extent that the securities laws are premised upon a property rights doctrine, we agree that unauthorized disclosure that harms the principal constitutes a breach of a duty of

insufficient to constitute a breach.[32]

We also think the SEC's position is inconsistent with the principle "that §
10(b) is not an all-purpose breach of fiduciary duty ban." O'Hagan, 521 U.S. at
655, 117 S. Ct. at 2209 (citing Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 97 S.

_____

loyalty and confidentiality. However, the securities laws are not based on property rights alone. An "animating purpose" of the Exchange Act is to "[e]nsure honest securities markets and thereby promote investor confidence." O'Hagan, 521 U.S. at 658, 117 S. Ct. at 2210 (citing 45 Fed. Reg. 60412 (1980)). For this reason, trading on material, nonpublic information (not just possessing, disclosing, or stealing) is essential to incur insider trading liability. Judge Winter, in his dissent in Chestman and his panel decision in United States v. Libera, 989 F.2d 596 (2d Cir. 1993), has advocated a property rights approach to insider trading laws. While his views make practical sense, we cannot ignore the fact that insider trading prohibitions, in the end, must be premised on fraud. Judge Winter's statement in Libera, 989 F.2d at 600 – that the misappropriation theory's purpose "is to protect property rights in information" – is therefore incomplete in that it ignores the fact that the theory's essential purpose must be the prevention of fraud. See O'Hagan, 521 U.S. at 655, 117 S. Ct. at 2209 (stating the misappropriation theory is consistent with § 10(b) because it involves "manipulation or deception").

[32] We note that the SEC's argument that mere disclosure is sufficient to constitute the requisite breach for imposing insider trading liability is simply an extension of the same argument it made in Dirks: "an insider invariably violates a fiduciary duty to the corporation's shareholders by transmitting nonpublic corporate information to an outsider when he has reason to believe that the outsider may use it to the disadvantage of the shareholders. Thus, regardless of any ultimate motive . . . [the insider] breached his duty to . . . [the corporate shareholders]." Dirks, 463 U.S. at 666 n.27, 103 S. Ct. at 3267 n.27 (internal quotation marks omitted). The Supreme Court rejected that argument, stating:

> [The SEC's] perceived "duty" differs markedly from the one . . . that has been the basis for federal tippee-trading rules to date. . . . [T]o constitute a violation of Rule 10b-5, there must be fraud. There is no evidence that . . . [the insider's] disclosure was intended to or did in fact "deceive or defraud" anyone. [The insider] . . . certainly intended to convey relevant information . . . [but] [u]nder any objective standard . . . [the insider] received no direct or indirect personal benefit from his disclosure. . . . [It is] inside trading for personal gain [that] is fraudulent, and . . . [constitutes] a violation of the federal securities laws.

Id. (internal citations omitted).

Ct. 1292, 51 L. Ed. 2d 480 (1977)). Section 10(b) "trains on conduct involving manipulation or deception." Id. This manipulation or deception, i.e., fraud, "is consummated . . . when, . . . [the fiduciary] uses the information to purchase or sell securities" and thereby "gain no-risk profits"; if the information is put to an "other" use, no breach has occurred for purposes of the securities laws. Id. at 656, 117 S. Ct. at 2209. In other words, § 10(b) "does not catch all conceivable forms of fraud involving confidential information; rather, it catches fraudulent means of capitalizing on such information through securities transactions."[33] Id. Should we adhere to the SEC's approach of imposing liability merely because the outsider "harmed" the principal in some way, however, the outsider potentially could be liable for insider trading where not even the slightest intent to trade on securities existed when he disclosed the information.[34]

---

[33] The necessity that confidential information be put to use through securities transactions stems from § 10(b)'s requirement that chargeable conduct involve a "deceptive device or contrivance" used "in connection with the purchase or sale of [a] security." 15 U.S.C. § 78j(b).

[34] Suppose the CEO of a public company, decides, after conferring with select members of the company's management, to confide in his wife that he is an alcoholic and is entering a rehabilitation center. Suppose he has continually confided with her over the years and she has never broken his trust. Also suppose that the day after he enters rehab, his wife discovers that he was having a love affair with another woman. Angry, the wife decides to humilate her husband by disclosing his alcohol problems to the local newspaper editor. The editor is savvy, and realizes that news of the CEO's alcoholism would likely cause the stock price to fall. Accordingly, the editor buys put options in the husband's company before printing the story. When the story hits the newstand, and the stock price falls, the editor makes lots of money. The question is whether the wife and the editor are liable. The information regarding her husband's alchoholism is material and nonpublic, the wife breached a duty of loyalty and confidentiality with her husband, the editor was aware of the wife's breach, and the husband is harmed

27

Our conclusion that the SEC must establish that all tippers, both insider

and outsiders, intend to benefit from their disclosure of confidential information

is amply supported by language in O'Hagan. There, the Court observed that an

outsider who "pretends loyalty to the principal while secretly converting the

principal's information for personal gain dupes or defrauds the principal. Id. at

653-54, 117 S. Ct. at 2208 (emphasis added) (internal quotation marks and

alteration omitted). Likewise, an outsider "who trades on the basis of material,

nonpublic information, in short, gains his advantageous market position through

deception." Id. at 656, 117 S. Ct. at 2209 (emphasis added). In the same vein:

"The misappropriation theory targets information of a sort that misappropriators

ordinarily capitalize upon to gain no-risk profits through the purchase or sale of

securities. . . . [The theory] catches fraudulent means of capitalizing on such

information through securities transactions." Id. (emphasis added). Finally, it is

a fiduciary's "self-serving use of a principal's information to purchase or sell

---

(emotionally, financially, and in terms of his reputation). But, the wife did not disclose the information with the intent that anyone would trade or benefit; she merely wanted to harm her husband emotionally.

Under the SEC's approach the wife would be liable for the disgorgement of all of the editor's profits. The securities laws, however, are not designed to impose liability on a person who had no intent to trade or manipulate the market. Section 10(b) requires fraud "in connection with" the purchase or sale of securities. Id.

28

securities" that constitutes a breach of duty of loyalty and confidentiality.[35] Id. at 652, 117 S. Ct. at 2207 (emphasis added).

All of the above quoted language from O'Hagan explicitly states or implicitly assumes that a misappropriator must gain personally from his trading on the confidential information. If we were to hold that a misappropriator who tips – rather than trades – is liable even though he intends no personal benefit from his tip, then we would impose liability more readily for tipping than trading. Such a result would be absurd, and would undermine the Supreme Court's rationale for imposing the benefit requirement in the first place: the desire to ensure that a tip rises to the level of a trade. See Dirks, 436 U.S. at 664, 103 S. Ct. at 3266 ("The tip and trade resemble trading by the insider himself followed by a gift of the profits to the recipient."). The better approach, in our view, is to follow Dirks and ensure that an outsider who tips must have done so with the intent of benefitting from the tippee's trading.

Finally, and perhaps most importantly, the need for an identical approach to determining tipper and tippee liability under the two theories becomes evident when one realizes that nearly all violations under the classical theory of insider

---

[35] We also highlight the fact that the misappropriating defendant in O'Hagan gained personally from his trading.

29

trading can be alternatively characterized as misappropriations.[36]  See

Langevoort, supra note 29, at § 6:13.  To allow the SEC to avoid establishing the

personal benefit element simply by proceeding under the misappropriation

theory instead of the classical theory would essentially render Dirks a dead letter

in this circuit.  Such an effect would be unwarranted, particularly in light of the

fact that O'Hagan incorporated its principals with, rather than overruled, Dirks.[37]

Requiring an intent to benefit in both classical and misappropriation

---

[36] Indeed, the case at hand – which involves the intentional disclosure of confidential information by a corporate insider – fits the facts of a case typically brought under the classical theory of insider trading.

[37] One district court recently expressed its concern about the SEC skirting Dirks by expanding the use of the misappropriation theory:

> Misappropriation theory is targeted at "outsider" trading, i.e., breaches that do not involve a duty to the traded company and its shareholders.  This case, however, involves a breach of a duty allegedly owed to an insider in the company whose securities were traded.  Generally speaking traditional insider trading liability addresses such breaches through tipper-tippee liability [i.e., classical theory].  The government is attempting to redeploy misappropriation theory here to the rare case w[h]ere the intentional disclosure of material, nonpublic information by an insider does not result in tipper-tippee liability.  While this alone is not reason to reject the government's argument, it does show that this case falls outside the misappropriation paradigm.

United States v. Kim, 184 F. Supp. 2d 1006, 1012-13 (N.D. Cal. 2002) (footnote omitted).
The case at hand, like Kim, is an example of an intentional disclosure of information by an insider of a company whose securities were traded.  And like Kim, the SEC could not establish liability under the classical theory because the corporate insider had not tipped with the requisite scienter.  We agree with Kim that although the lack of being able to establish liability under the classical theory does not forego liability under the misappropriation theory, the imposition of liability under the misappropriation theory in the typical classical theory scenario causes concern that liability for insider trading could turn on the label of the theory under which the SEC brings its case and that Dirks is being systematically ignored in the process.

30

theory cases equalizes the positions of tippers and tippees and is also consistent with Supreme Court precedent. Perhaps the simplest way to view potential insider trading liability is as follows: (1) an insider who trades is liable; (2) an insider who tips (rather than trades) is liable if he intends to benefit from the disclosure; (3) an outsider who trades is liable; (4) an outsider who tips (rather than trades) is liable if he intends to benefit from the disclosure.

Having concluded that the SEC must prove that Donna expected to benefit from disclosing the confidential information to Burch – the position the SEC took in its complaint – we now consider whether the SEC provided sufficient evidence for a jury reasonably to find such an expectation.[38] Viewing the facts in the light most favorable to the SEC, we conclude that the SEC did so.

The showing needed to prove an intent to benefit is not extensive. The Supreme Court in Dirks, after establishing the tipper benefit requirement, proceeded to define "benefit" in very expansive terms. The Court declared that not only does an actual pecuniary gain, such as a kickback or an expectation of a reciprocal tip in the future, suffice to create a "benefit," but also cases where the tipper sought to enhance his reputation (which would translate into future

_____

[38] Determining whether a tipper expected to benefit personally from a particular disclosure is a question of fact. See Dirks, 463 U.S. at 664, 103 S. Ct. at 3266. We, therefore, can reverse only if the jury's findings were clearly erroneous. See, e.g., Commody Futures Trading Comm'n v. R.J. Fitzgerald & Co., 310 F.3d 1321, 1331 (11th Cir. 2002).

earnings) or to make a gift to a trading relative or friend.  See Dirks, 463 U.S. at 663-64, 103 S. Ct. at 3266.

In this case, the SEC presented evidence that the two appellants were "friendly," worked together for several years, and split commissions on various real estate transactions over the years.  This evidence is sufficient for a jury reasonably to conclude that Donna expected to benefit from her tip to Burch by maintaining a good relationship between a friend and frequent partner in real estate deals.  See Sargent, 229 F.2d at 77 (finding evidence of personal benefit when the tipper passed on information "to effect a reconciliation with his friend and to maintain a useful networking contact").  Accordingly, the SEC has sufficiently established the second element of a misappropriation theory claim – a breach of a duty of loyalty and confidentiality.

### III.

Having concluded that the evidence was sufficient to withstand appellants' motions for judgment as a matter of law, we turn to the question of whether the district court erred in instructing the jury on the elements of the SEC's claims and, if error occurred, whether it was harmless.[39]  The district court accepted the

___

[39] A district court has broad discretion in formulating jury instructions; we accordingly apply a deferential standard of review.  Toole v. Baxter Healthcare Corp., 235 F.3d 1307, 1313

argument the SEC advances here: all it had to show to establish a breach of loyalty and confidentiality was that Donna acted with "severe recklessness" in letting Burch know what David had told her about Scholastic's anticipated earnings announcement. Over appellants' objections, the court instructed the jury as follows: (1) "the SEC must establish, by a preponderance of the evidence, that Mrs. Yun breached a fiduciary duty or other duty of trust and confidence to David Yun by disclosing to Mr. Burch material nonpublic information"; and (2) "[t]he communication of such information must be intentional, or severely reckless." The court rejected the appellants' argument that the SEC had to prove that Donna acted out of a motive to benefit herself, and thus denied appellants' proposed instruction, which stated: "[T]he disclosure has to be for the fiduciary's personal benefit to constitute a breach."

Our role "in reviewing a trial court's jury instructions [ ] is to assure that the instructions show no tendency to confuse or to mislead the jury with respect

---

(11th Cir. 2000). We must assure, however, "that the instructions show no tendency to confuse or to mislead the jury with respect to the applicable principles of law." Mosher v. Speedstar Div. of AMCA Int'l Inc., 979 F.2d 823, 824 (11th Cir. 1992) (quoting Rohner, Gehrig & Co. v. Capital City Bank, 655 F.2d 571, 580 (5th Cir. Unit B Sept. 1991)). If the instructions do not accurately reflect the law, "and the instructions as a whole do not correctly instruct the jury so that we are 'left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations,' we will reverse and order a new trial." Broaddus v. Fla. Power Corp., 145 F.3d 1283, 1288 (11th Cir. 1998) (quoting Carter v. DecisionOne Corp. through C.T. Corp. Sys., 122 F.3d 997, 1005 (11th Cir. 1997) (quoting Johnson v. Bryant, 671 F.2d 1276, 1280 (11th Cir. 1982)).

33

to the applicable principles of law." Mosher, 979 F.2d at 824 (internal quotation marks omitted). "We will not disturb a jury's verdict unless the charge, taken as a whole, is erroneous and prejudicial." Id. As our previous discussion makes clear, the district court erred in accepting the SEC's position that whether Donna anticipated a benefit was irrelevant. The question thus becomes whether the appellants were prejudiced.

The "severely reckless" instruction mentioned above, considered in the light of the court's overall charge on the SEC's burden of proof, permitted the SEC's counsel to tell the jury that the case turned on whether Donna tipped Burch "intentionally" or "severely recklessly." On three separate occasions, the SEC's counsel told the jury that it could find that Donna breached a duty to her husband – and therefore violated § 10(b) – if it found that she intentionally or severely recklessly divulged the confidential information regarding Scholastic:

> [I]t's enough that Ms. Yun told . . . [Burch] the Scholastic information at the party. She is then liable for intentionally tipping him or for acting with severe recklessness by revealing this highly confidential information . . . .
>
> . . .
>
> If Donna Yun breached a duty to her husband because she intentionally or severely recklessly gave Jerry Burch this information, then they should both be found liable.

. . .

> During the telephone call with the SEC, Ms. Yun claimed to specifically recall Mr. Burch walking into the office during the February 18th call with her attorney. . . . This admission is enough evidence . . . [f]or your to find that at the very least, [that] she acted with severe recklessness by revealing the information when she saw Mr. Burch was present.

We have little difficulty in concluding that the "severely reckless" instruction materially prejudiced the appellants, such that they are entitled to a new trial.[40] Given the court's improper instruction and the SEC's heavy reliance on that instruction in arguing its case to the jury, it is likely that the jury found against appellants on the ground that Donna acted with severe recklessness in disclosing the confidential information to Burch. See Christopher v. Cutter Labs., 53 F.3d 1184, 1195 (11th Cir. 1995) (commenting that counsel's strong reliance on an erroneous instruction in closing argument "improperly guided [the jury] in its deliberations"). It is also likely that whether Donna disclosed the

---

[40] In reaching this conclusion, we do not overlook that in instructing the jury as to the misappropriation theory of liability, the court said that the SEC had to show that "Mrs. Yun breached her alleged duty by sharing, for an improper purpose, material, nonpublic information about Scholastic Corporation with Mr. Burch." (emphasis added). The court did not go on to define what improper purpose meant, and given what the SEC's counsel said in closing argument, we are satisfied that the jury did not translate "improper purpose" into an "intent to benefit" directly or indirectly from Burch's put options trades.

information for her personal benefit was not a factor in its deliberations.[41]

Rule 61 of the Federal Rules of Civil Procedure provides the standard for harmless error. The rule states, in pertinent part:

> No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial . . . unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

Fed. R. Civ. P. 61.

The district court's error, reinforced in the SEC's closing argument to the jury, affected the appellants' substantial rights. Under the circumstances, our failure to grant appellants a new trial would be inconsistent with substantial justice. We therefore vacate the district court's judgment and remand the case for a new trial.

## IV.

In conclusion, we AFFIRM the district court's decisions denying

---

[41] In the face of the erroneous instruction, the appellants' attorneys were foreclosed from arguing that the jury could not find against their clients unless they found that Donna tipped Burch for her personal benefit.

appellants' motions for judgment as a matter of law.  Because we find prejudicial error in the district court's instruction on the elements of the misappropriation theory of liability, we VACATE the court's judgment and REMAND the case for a new trial.

SO ORDERED.